Argued December 3, 1946; affirmed March 11; rehearing denied
April 22, 1947

# BERKSHIRE *v.* HAREM

(178 P. (2d) 133)

*W. A. Wiest,* of Independence, for respondent.

*W. C. Winslow,* of Salem (Norman K. Winslow, of Salem, on brief), for appellant.

Before BELT, Chief Justice*, and ROSSMAN, LUSK, BAILEY and HAY, Justices.

ROSSMAN, C. J.†

This is an appeal by the defendant from a judgment based upon a verdict in favor of the plaintiff in the sum of $5,000 general damages and $2,500 punitive damages. The action was instituted by a complaint which charged that the appellant alienated from the respondent the affections of the latter's wife.

The appellant presents thirteen assignments of error. Eleven challenge rulings which respectively 1) overruled the appellant's motion for a nonsuit; 2) overruled objections made by the appellant to the reception of evidence concerning incidents that transpired after the complaint was filed; 3) sustained the respondent's objections to the receipt in evidence of his deposition; 4) overruled objections based upon contentions of immateriality made by the appellant to questions put to a Mrs. Pierce, who was a witness for the respondent; 5 and 6) overruled motions made by the appellant which sought to strike out testimony given by the aforementioned Mrs. Pierce and other testimony given by a Mrs. David, also a witness for the respondent; 7, 8, 9, 10 and 11) overruled objections to the receipt in evidence, through the medium of a deposition, of answers given by one Bergman, a witness for the respondent. The twelfth is predicated upon an exception which the appellant took to an instruction to

* Chief Justice when this case was argued.
† Chief Justice when this opinion was rendered.

the jury upon the subject of adultery. The thirteenth is based upon an exception which was saved to an instruction which authorized a verdict for the respondent even though the jury believed that a "lack of affection" existed between him and his wife before the appellant began his alleged wrongful conduct.

The respondent and his wife Frances were married in Eugene September 5, 1922, and are the parents of four children. At the time of the trial the respondent was 51 years of age and his wife was 43. Upon becoming married they made their home for a while upon a farm with the respondent's parents. A year later the couple bought a dairy farm and moved upon it. In 1934, when $2,300 of the purchase price of the farm remained unpaid, the mortgage proved that it was mightier than the deed, with the result that the family was compelled to find another home. For a while they lived in a structure to which the respondent referred as "a shack". In 1937 he built what he described as "a rough house" and the family moved into it. Shortly they abandoned that place and took up their abode in an old house near Creswell, the occupancy of which was given to the family in consideration for the respondent's services in feeding the owner's cows. A few months later the family was on the move again. This time they removed to a place called Mable where they remained for several months and then took up their home in a four-room house three miles outside of Eugene. A couple of years later the respondent undertook the purchase of a 45-acre tract several miles from Eugene and, with the assistance of his wife, built upon it a modest house. The family moved into it in 1941 and was living there when the events transpired which ushered in this lawsuit. During all of the period which we have just described the husband, according

to his testimony, "followed logging, sawmilling and farming." However, about the time that the family moved upon the 45-acre tract he became a millwright and received good wages. In the period before he became a millwright the story reflected by the evidence is "the simple annals of the poor."

In the span of years covered by the foregoing narrative the family home was visited upon two occasions by serious illness, and at another time Mr. Berkshire was the victim of an industrial accident which kept him idle for many months. The evidence mentions periods when the family's sole income was unemployment compensation. Husband and wife had no charge account and, according to the former, he "gave her money to buy groceries or clothing for the children, if I had it." Notwithstanding the fact that the family purse was a slender one, the children were regular attendants at school and blessed the home with dutiful and affectionate dispositions. According to the husband, no difficulties transpired in the passing years between him and his wife of any greater consequence than "a little spat now and then." The words just quoted were taken from his testimony and relate to a time which preceded the events to which we will presently proceed. Referring to the same period and also to his wife, the respondent said, "She thought the world of me."

■ Mrs. Berkshire did not concede that her married life was happy. She mentioned a purported incident of a serious nature which she said occurred some years ago, but dwelled largely upon the fact that she "couldn't have things at home" and that she was compelled to live in houses which were poorly equipped for convenient living. She complained particularly about her scant wardrobe. However, our purpose in

giving this narrative is not to indicate which side of the controversy is supported by the truth, but only to afford a basis for determining the merits of the assignments of error. We shall, therefore, leave unmentioned evidence at variance with that produced by the respondent.

In the early part of October, 1944, Mrs. Berkshire accepted employment as a housekeeper in a home many miles distant from that of her family. It lasted a month and a half. At its termination she stayed home for a short time and then worked as a domestic in other homes. About seven months after the first of these jobs she met the appellant. Until she met him the family always knew the place of her employment and visited her frequently.

A few days prior to April 25, 1945, Mrs. Berkshire was not employed but was home with her family. On April 25, when Mr. Berkshire returned home at the end of his day's work, his wife was not there. She had left no explanation for her going and no indication as to where she could be found. No one had information of her whereabouts. From that day, except for a ten-day period in October, 1945, which will later receive our attention, Mrs. Berkshire was never again in the family home. The appellant admits that he met Mrs. Berkshire April 24. Whether or not his acquaintance with her influenced her to go into hiding April 25 is a matter of conjecture.

When Mrs. Berkshire did not return home, the respondent and his children began a search for her. June 15, 1945, they discovered that she was working in the home of a family named David. Before the respondent located his wife his search for her took him, on May 28, to a Eugene hotel, of which the appellant was the proprietor and which was known as

Central Rooms. It had thirty-six rooms. Until May 28 the respondent and the appellant had never met. When he went to Central Rooms the respondent was accompanied by a Mrs. Pierce, who was Mrs. Berkshire's sister. The two showed the appellant photographs of Mrs. Berkshire and asked him whether or not he had seen her. His replies were in the negative.

As a matter of fact, Mrs. Berkshire had been a guest in Central Rooms and had actually worked there for the appellant prior to May 28. The answers which he gave to the respondent and Mrs. Pierce were not true. Whether or not they were knowingly false was one of the issues at the trial. The appellant met Mrs. Berkshire, so he conceded, April 24, when she came to his hotel as a guest. Her stay at that time included two days of employment. She shortly became known to him as Dolly Francis and there is no evidence that he then knew she was married. Following the temporary employment, Mrs. Berkshire left Central Rooms, but May 1 was back again and this time registered as Dolly Francis. Upon this second occasion, according to his testimony, she was a guest for one week and was then given two weeks' employment. Accordingly, she had lived in his hotel for more than three weeks when the respondent made his call May 28. As the two-week period which we just mentioned was drawing to a close, the appellant called at the home of a friend, Mrs. Ruby David, and recommended to her Mrs. Berkshire as a capable domestic. Mrs. David's words were: "He came down and said he knew someone that wanted to work." In an hour or so Mrs. Berkshire, upon the appellant's suggestion, called at the David home and was given employment. She worked there for the succeeding six weeks and left on July 1.

In the above period the respondent, his children and his sister-in-law maintained their search for Mrs. Berkshire. One day one of the children met her mother on the street and shortly discovered that she was working in the David home. Before the latter fact was discovered the search led the respondent and Mrs. Pierce to make the visit to Central Rooms on May 28, which we have already mentioned. Two days previously, that is, on May 26, Mrs. Pierce and one of the Berkshire children made a similar visit to Central Rooms. While there they showed the appellant photographs of Mrs. Berkshire and questioned him as to whether the woman in the photographs was working in the hotel or was a guest there. All of the replies were in the negative. The descriptions of Mrs. Berkshire which were given to the appellant upon these occasions were complete and included such intimate details concerning her as "having a plate, an upper plate." We quoted from the appellant.

June 15, 1945, while Mrs. Berkshire was employed in the David home, the respondent discovered that fact and called upon her. He tried to induce her to return home but failed. July 1 two of the Berkshire children paid their mother a visit in the David home. They swore that they arrived at 7:30 a. m., before their mother had arisen and that in a few minutes the appellant appeared at her bedroom window and rapped upon it. Their mother then went to the door, according to their testimony, and admitted the appellant who promptly placed his arms around her. The evidence indicates that Mr. Harem, the appellant, ate breakfast that morning with Mrs. Berkshire and remained in the David home with her all morning. He concedes that by that time he knew that Mrs. Berkshire's name was not Dolly Francis, that she was the mother of children

and that her name was Berkshire. He admitted that by June 9 he had information concerning her matrimonial status, but explained that he "didn't know positively" the facts at that time. The children's visit occurred July 1. On that day Mrs. Berkshire quit her employment at the David home. According to Mrs. Berkshire, who was called as a witness by the appellant, the latter discovered her correct name "as near as I know, it was in June." At that time she explained to him, so she swore, that she had a husband who was living.

After he had become acquainted with Mrs. Berkshire, the appellant showed her attention. He took her to a dance, to a supper, upon automobile rides and to motion picture theaters. June 15, he acquired a hotel in Independence known as the Independence Hotel and some time prior thereto had acquired one in Monmouth. June 15 Mr. Harem took Mrs. Berkshire to see his new possessions and she spent the night in the Monmouth hotel.

Mrs. Berkshire was back again in the Independence Hotel July 4 and spent the night there. A day later she entered the appellant's employ in a capacity which he described as "domestic and commercial maid."

According to Mr. Harem, one-fourth of the lower floor of the Independence Hotel was occupied by him personally. That part is separated from the rest of the floor by a door and constitutes an apartment. It includes two adjacent bedrooms. After Mrs. Berkshire had entered the appellant's employ in Independence she occupied one of these bedrooms and he the other. She prepared his meals and the two ate together at the same table in the apartment.

It will be recalled that the appellant took Mrs. Berkshire with him to Independence on June 15. He

denied in general words that his relations with her were improper, and we shall, therefore, give his version of the night of June 15. We think that his own words indicate that he shied away from questions which asked him with whom Mrs. Berkshire stayed. The following is his testimony, taken from his direct examination:

"Q. When she went to there how long did she stay?

"A. Oh, my trailer broke down on the road, and she went back the next morning, because she had to be—

"Q. That doesn't answer the question. She came to Independence. How long did she stay while she was at Independence?

"A. Oh, just one day.

"Q. Well, did she stay overnight?

"A. Yes.

"Q. With whom did she stay?

"A. She stayed at the Monmouth Hotel.

"Q. With whom, anybody?

"A. Yes, my boy was there."

That is as far as that line of inquiry went. Mrs. Berkshire gave no testimony upon that subject.

Mrs. Berkshire testified that although she generally spent the nights in the Independence Hotel, she occasionally occupied a room in the Monmouth Hotel, which, it will be recalled, the appellant owned. Mrs. Pierce testified that on one of her visits to Independence her sister, Mrs. Berkshire, took her to the Monmouth Hotel; she then continued:

"Q. Did she show you any bedroom up there that she had occupied?

"A. Yes, she showed me a bedroom which is hers which had a pair of man's bedroom slippers—"

At that point appellant's counsel objected. After the ruling the questioning continued as follows:

"Q. What were the articles, or what was the article of men's wearing apparel that you saw?
"A. Bedroom slippers and ties.

"Q. And what?
"A. Men's bedroom slippers and ties.

"Q. Ties. Do you mean—What kind of ties?
"A. Neckties.

"Q. Neckties. Now, these two bedrooms in the Independence Hotel that you referred to, you and your sister slept in one of them?
"A. Yes, sir.

"Q. And you say you saw Mr. Harem coming out of another one?
"A. Yes, sir.

"Q. How far away from your sister's bedroom was the one out of which Mr. Harem came?
"A. Adjoining, just like there was a wall between and a door between two rooms entering out into a hall."

From the appellant's testimony as given upon direct examination, we quote:

"Q. Did you have any slippers over in that room, or any neckties, or anything of that kind?
"A. She went with who?

"Q. She says she went with Mrs. Berkshire over to a room at the Monmouth Hotel where Mrs. Berkshire had been staying, or had stayed or something of the kind.
"A. I don't think I had anything in the room.

"Q. Well, do you know whether you did or not?
"A. What?

"Q. Do you know whether you did or not?
"A. Well, no. I couldn't say for sure.

* * * * *

"Q. * * * did you have any of your personal effects over in the Monmouth Hotel?

"A. I presume there might have been. Might be quite a bit of my personal effects over there.

"Q. Were there any in the room she was occupying?

"A. I couldn't say. I haven't been in the room at that time.

"Q. Well, don't you know where your personal stuff is?

"A. No, I don't know where all my personal stuff is."

Mr. Bergman, who is mentioned in the seventh, eighth, ninth, tenth and eleventh assignments of error, visited the appellant in the Independence Hotel October 3. He testified that during the course of the visit the appellant showed him the room which he occupied and also the one occupied by Mrs. Berkshire. Continuing, he said:

"From where I was standing, however, I could see that the bed in his room had been disturbed but hers had not."

As we have indicated, the respondent called upon his wife while she was employed in the David home in June and urged her to return to her family. He did not see her again until July 13 when he called upon her at the Independence Hotel. The hour was about 8:30 a. m. At that time she was in the appellant's employ. Three days after that visit the respondent instituted the action which is now under review.

July 13, when the respondent entered the Independence Hotel, no one was in the lobby and the door which led from the lobby into the apartment which Mr. Harem and Mrs. Berkshire occupied was locked. The respondent was accompanied upon that occasion,

as he had been on May 28 when he visited Central Rooms, by Mrs. Pierce. According to his testimony, he knocked loudly upon the locked door for a half hour before there was a response. Then the appellant appeared at the door, and the respondent inquired whether his wife was in the back room. The answer was in the affirmative, and the respondent said that at that point the appellant told him, "You are not going back there." Presently Mrs. Berkshire came to the door, her hair disheveled and buttoning her dress. Mr. Berkshire swore that he then tried to tell his wife that her cousin had died and that a request had been made for her to attend the funeral but that the appellant protested against his having any conversation with her and rendered it impossible for her to answer his questions. He testified that the appellant addressed Mrs. Berkshire with the order, "You are not going outside the door." When the respondent sought to embrace his wife, Mr. Harem, according to the evidence, grabbed the respondent and called the police. Before an officer arrived the two men exchanged heated remarks and after the officer entered the hotel the respondent was required to leave.

The foregoing was the last visit which the respondent had with his wife before this action was instituted.

We come now to a delineation of events which transpired after the action was instituted.

The respondent returned to Independence August 3 accompanied by his children, and, upon the request of a police officer, Mrs. Berkshire came to the street where the respondent invited her to have dinner with her family and to return home with them. Both invitations were refused.

September 9 the respondent again went to Independence. He was accompanied by his three youngest

children who induced their mother to come out to him. He and his children thereupon tried to put her into their automobile. Their efforts failed and they returned home without her.

October 3 the respondent returned to Independence. He was accompanied by Mr. Bergman whom we have mentioned. Mr. Bergman persuaded Mrs. Berkshire to accompany him and the respondent to the Berkshire home. She remained there for ten days and in that period, according to the testimony of all except Mrs. Berkshire, happiness prevailed. Husband and wife lived together as previously, and the children took delight in their mother's presence. The mother added some new furnishings to the home such as a bed, mirrors and pictures. She visited about the neighborhood and enjoyed working in the kitchen with the children. On the tenth day the family went to Eugene where they partook of ice cream and did some shopping. In the midst of the pleasures Mrs. Berkshire disappeared, entered a taxicab, drove to her home and, after securing her belongings, returned to the Independence Hotel. She re-entered the appellant's employ.

It will be recalled that Mrs. Pierce accompanied the respondent upon the visit to the Independence Hotel July 13. She swore that on that day whenever Mrs. Berkshire wished to speak to her husband or the children, "Mr. Harem ordered her back, he demanded her to stay there, not to go outside the door." August 13 Mrs. Pierce returned to Independence. She said that the appellant continuously referred to her sister as "Dolly", and added, "Everything was Dolly; Dolly this, and pat her on the back, and call her Dolly." Mrs. Pierce, accompanied by a friend, called upon her sister in Independence November 6. At that time, as upon other occasions, she tried to persuade her sister to

return home. After she and her friend had spoken to Mrs. Berkshire for some minutes, the appellant, according to Mrs. Pierce, broke in upon them with the exclamation, "You kept that woman crying for two hours * * *. You ladies go away and come back in an hour or two." Obedient to that demand, they left, but upon their return found that the appellant seated himself in the room in which they wished to speak to Mrs. Berkshire or followed them when they went into another room. She also swore that the appellant "got into a few words" with her friend and shook his fist, not only at the latter, but at Mrs. Pierce also. Their efforts to induce Mrs. Berkshire to return home were unavailing.

Leta, the nineteen-year-old daughter of the Berkshires, gave her version of the visit which was made to her mother August 3. She, her brother and two sisters accompanied their father upon that occasion. When the mother came to the automobile in which her father was seated, an invitation was given her to have dinner with the family and she promised to accompany them. Going on, Leta testified that her mother then re-entered the hotel, had a whispered conversation with the appellant, went to her bedroom and "fumbled" about as if she were preparing to dress for dinner. It will be recalled that upon that occasion a police officer had induced Mrs. Berkshire to go out to the street where her family was waiting. After twenty minutes had passed the police officer left and thereupon, according to Leta, the appellant told her mother that she could not accompany her family to dinner, and "told us kids to get out and leave her alone; he would throw us outside. He had enough trouble over it already. He was going to throw us kids out." In the end Mrs. Berkshire declined the dinner invitation. The children

left the hotel and, in company with their father, returned to Eugene.

Leta described the visit which was made to her mother September 9. Those present in addition to herself were her father, her brother and one of her sisters. She said that upon reaching the hotel the children entered, sought out their mother and asked her to return home. The reply was, so Leta testified, that "she might get to go home if she got the beds made up in time." Thereupon the children helped with the bed-making, under the watchful eye of Mr. Harem who followed their movements closely. One of the maids in the hotel was a Mrs. Layton. The witness, referring to the appellant, testified: "He told Mrs. Layton not to let Mom—or not to have us kids get Mom outside and put her in the car, and then when we went downstairs why—well, Mrs. Layton said, 'I will be watching for you; I will be waiting for you; I will be looking for you'." Leta explained that the remark was addressed to her mother, and swore that the appellant twice told the children, "Better get out of here, or I will throw you out." Finally, the children induced their mother to go outside to the automobile in which their father was seated and it was then that the effort was made to put Mrs. Berkshire into the car. When the struggle commenced Mrs. Layton, according to Leta, "was up in the top third window yelling for the police," but shortly rushed to the sidewalk and lent her assistance to Mrs. Berkshire. The father and his children returned home alone.

November 17, 1945, the respondent signed an information which charged that his wife was insane. December 26 and 27 a hearing was held upon the information, at the close of which the court ruled that Mrs. Berkshire

was competent. The appellant and one of his sons, Fred, attended the hearing. After the court announced its opinion, Mrs. Berkshire, according to Mrs. Pierce, went to Fred "and put her arms around his neck and kissed him." Mrs. Bertha Lewis, a neighbor of the Berkshires, who also attended the insanity hearing, swore that at its close Mrs. Berkshire "went down to Mr. Harem, and she hugged and she kissed Mr. Harem's son." Although her own children were present, she showed them no attention and left the courtroom in the company of the aforementioned Mrs. Layton. Two of the witnesses testified that when the appellant left the hearing room he said to his son, "We have got her; we have got her."

The appellant swore that his relations with Mrs. Berkshire were never improper. He asserted that he never denied her the privilege of returning to her family if she cared to do so, and added that throughout the period while he was operating the Independence and Monmouth hotels the labor situation was difficult.

Referring to the day in April of 1945 when she left home unannounced, Mrs. Berkshire testified:

"I had intentions of going back, but I knew that I would try to find work somewhere. I might work where I could be—so I could be home on week ends, or something like that, or try to keep the home up.

"Q. Yes. When was it that you first met Mr. Harem?

"A. Towards the latter part of April.

"Q. April. And before you met Mr. Harem, you still felt that you would be going back to your family after you had worked a little while, is that right?

"A. Well, yes, sir."

■ Apart from an occasional minor fact which we shall mention later, the above will suffice as a review of those parts of the evidence which are essential to a consideration of the assignments of error. The foregoing renders it manifest that affection still existed upon the part of the wife for her husband and family when she met the appellant in April, 1945. It may be that at that time affection had receded to a low ebb, but, according to the testimony which we quoted from the wife, she "had intentions of going back * * * to keep the home up" when she left in April. Reconciliation was still possible. In fact, five months later, when Mr. Bergman lent a few minutes of kindly ministrations to the situation, he found that Mrs. Berkshire still had enough attachment for her family that he was able to induce her to return home. Then came a ten-day stay in the family home and a resumption of the relationship of husband and wife which demonstrated that the affinity which caused these two people to be united as husband and wife a score of years previously still exercised dominion.

Before considering the first assignment of error, which is based upon the denial of the appellant's motion for a nonsuit, we shall dispose of those which challenge rulings concerning the evidence.

The second assignment of error attacks rulings which received the evidence recited in previous paragraphs of this opinion concerning incidents which transpired after this action was instituted.

■ Although normally the institution of an action, wherein a spouse claims that an interloper alienated the affections of the former's mate, may cause the purported wrongdoer to avoid behavior of a compromising character, yet it is generally held that conduct pursued by him even after action is begun, if otherwise

relevant, is admissible: *Caplan v. Caplan,* 83 N. H. 318, 142 Atl. 121; *Hoxie v. Walker,* 75 N. H. 308, 74 Atl. 183; *Regenvetter v. Ball,* 131 Wash. 155, 229 P. 321; *Curtis v. Miller,* 269 Pa. 509, 112 Atl. 747; *Slaton v. Milburn,* 180 Ky. 655, 203 S. W. 529; *Worth v. Worth,* 48 Wyo. 441, 49 P. (2d) 649, 103 A. L. R. 107.

In some of the cases just cited it was the purported enticer who offered the challenged testimony concerning his post-action conduct. Normally, it would be expected that after an action was filed against an alleged enticer he would be cautious and that his post-action conduct would be so influenced by the pending action as to deprive it of evidential value. But, if his conduct is material, evidence pertaining to it is admissible notwithstanding the circumstances just mentioned. They affect the weight, but not the admissibility of the evidence. Since evidence concerning subsequent conduct is admissible when offered by the alleged wrongdoer, it seems clear that it must be admissible when presented by the spouse who claims he was wronged; provided, of course, it is relevant.

The item of testimony which is particularly challenged by this assignment of error is the delineation of the struggle which occurred September 9 when the respondent and his children tried to get the mother into an automobile which was waiting to drive her home. Concerning that evidence, appellant's brief says:

"They were permitted to go to the extent of showing an attempt physically to take Mrs. Berkshire home. In other words, they had a good, old-fashioned family row. Mrs. Layton interferred and their efforts were not successful. But what has that to do with the relationship of appellant and Mrs. Berkshire? Appellant was not even present."

■ In determining whether or not the struggle of September 9 throws light upon the issue as to whether the appellant wrongfully deprived the respondent of the consortium of his wife, we revert to the testimony of Leta. It will be recalled that she swore that while her father remained in the street, the children entered the hotel and invited their mother to return home. The reply, according to Leta, was that "she might get to go home if she got the beds made up in time." Thereupon the children helped to make the beds, but while they were doing so the appellant watched their movements closely and ordered Mrs. Layton "not to let Mom—or not to have us kids get Mom outside and put her in the car." It will also be recalled that Leta swore that when the children finally induced their mother to leave the building, Mrs. Layton, after calling the police, rushed out to the car and prevented the father and his children from placing Mrs. Berkshire in it. Leta's testimony, if believed, shows that 1) the appellant interfered with the relations between the mother and her children; 2) directed one of his employes to prevent Mrs. Berkshire from leaving the building; and 3) induced the same employe to use physical force to prevent a step being taken which might have effected a reconciliation. We are satisfied that all of the testimony challenged by this assignment of error was material and admissible.

The third assignment of error says:

"The Court erred in refusing to admit into evidence the deposition of respondent."

Upon motion of the appellant, based upon § 4-303, O. C. L. A., and supplemented by a stipulation of the parties, the deposition of the respondent was taken before the trial. It shows that the respondent, in re-

ferring to his visit to the Independence Hotel on July 13, 1945, testified:

"A. I tried to get my wife to come home and she wouldn't come.

"Q. Did Harem have anything to say about whether she would go or not?

"A. I don't know whether he had to her or not.

"Q. Did he in your presence?

"A. Not that I can recall in my presence to me.

"Q. To her or to you, either one, in your presence?

"A. No."

Before making those answers the respondent swore that the appellant 1) "began to blow up" the moment he, the respondent, expressed a wish to speak to his wife; 2) told the respondent that he was not wanted in the hotel; 3) ordered him to "keep your hands off of her" when he started to put his arms around his wife; and 4) called the police "to throw me out." The entire deposition, including its caption and the stipulation of parties, covers only ten typewritten pages; the respondent's testimony at the trial, as transcribed, covers ninety-six pages. In his direct examination, he was asked and answered as follows:

"Q. Well, before the police came did anybody prevent your wife from answering your question or statement?

"A. No.

"Q. Did Mr. Harem say anything when you asked her to go home?

"A. Yes, he did.

"Q. What did he say?

"A. He ordered her back and says, 'You're not going outside the door'."

The appellant claims that the two sets of answers are contradictory and that, therefore, prejudicial error was committed when the court ruled that the deposition was not receivable as evidence.

We shall now describe the manner in which the deposition was offered. Toward the close of the cross-examination of the respondent, which did not mention the specific subject covered by the part of the direct examination just quoted, appellant's counsel said:

"I offer in evidence his deposition."

Respondent's counsel said:

"I have no idea in the world what he is referring to as being contained in there. There is no objection to the deposition, so far as I know, but I think it ought to be more specific."

Appellant's counsel then declared:

"I am offering it all. * * * The only purpose in offering it at this time is with reference to the difference in story he told with reference to the incident at the time of taking the deposition and the way he has told it now."

Respondent's counsel replied:

"* * * If there are certain features here that counsel wants to cross-examine him on, I would say, fine, so that we can explain it, but just simply to throw in a whole deposition and say, 'There is the whole deposition,' I don't think that is fair."

Shortly the trial judge said:

"I will sustain the objection, if there is an objection."

After more colloquy, the court ruled:

"Of course, you understand that the rule of the court—I am not sustaining the objection. I don't

want you to get the wrong impression. I am sustaining the objection to asking him relative to his testimony. I am simply sustaining the objection as to the offer of the deposition as a whole without calling his attention to those particular portions of it.''

After the ruling the appellant did not seek to read any part of the deposition, nor did he use any of it for cross-examination. In short, after the ruling, the deposition was never mentioned again.

The brief filed by the appellant's counsel makes it clear that he understands the ruling to have meant that relevant parts of the deposition could have been used for impeachment purposes. The brief says:

"It will be contended the Court did not prohibit us from using it for the purpose of impeachment. That raises the whole question that is here involved. Is it necessary to use this deposition solely for the purpose of impeachment, or is it admissible as the statute says? Section 4-505 (O. C. L. A.) says in plain language: 'A deposition taken pursuant to the provisions of this title may be used by either party upon the trial or proceeding—.''

The appellant does not argue that any part of the deposition, other than that quoted, was material to his purposes.

■■ This assignment of error presents the question as to whether the entire deposition was admissible in evidence, although only a minor part of it was material to the issue in which the appellant was interested. The fundamental rule of evidence is that nothing is admissible except that which is material. Material evidence is admissible provided it does not impinge upon the exclusionary rules. Stated otherwise, immaterial evidence is inadmissible. Section 4-505, O. C. L. A., which

is mentioned in the language quoted from counsel's brief, and which says that "a deposition taken pursuant to the provisions of this title may be used by either party upon the trial," certainly is not intended to make material evidence lacking that quality.

We think that the answer to appellant's contention is given in *Wulferdinger v. Pickwick Stages System*, 105 Cal. App. 509, 288 P. 93, where the defendant-appellant presented substantially the same issue as the one before us. The plaintiff in that case had testified that a stage in which she was a passenger was traveling at a speed of "perhaps 45 miles an hour" immediately preceding her injury. She was not cross-examined upon that statement. Later, as a part of the defendant's case, a deposition of the plaintiff was offered in evidence. An objection was made to it by the plaintiff and sustained. At that juncture defendant's counsel was afforded the privilege of asking the plaintiff whether, in the course of her deposition, she did not say. "The bus was going along at a rate of speed of about 35 miles an hour until * * *" She replied: "If that's my deposition, I must have said it; I don't remember." Following the answer, and according to the decision, "the deposition was not thereafter offered to impeach her. No purpose for reading the deposition in evidence except to impeach the plaintiff upon her testimony with respect to the speed of the stage was assigned." The matter was before the Court of Appeals upon a motion of the defendant-appellant for an order requiring the deposition to be certified to that court.

We quote again from the decision:

"When the reading of the deposition was first offered by the defendant, the attention of the court was not called to any material subject-matter which it contained that was not fully covered by her

previous oral examination at the trial. The deposition of the witness having been taken under sub-division (1) of section 2021 of the Code of Civil Procedure as a party to the action, the defendant would have been entitled to read it in evidence, notwithstanding her personal appearance at the trial, provided it contained anything material to the issues which were not covered by her oral examination at the trial. It is not claimed any such omitted evidence is contained in the deposition. The permission to read the deposition of a witness, under section 2022 of the Code of Civil Procedure, when he is a party to the action and all the material evidence therein contained has been fully covered by an examination of the witness at the trial, is discretionary with the court.''

The motion was denied.

■ The fact that a part of a deposition is material to an issue does not render admissible other parts which are immaterial. The provision of § 4-505, which we quoted and which includes the word "used", does not enable a deposition to be used differently from other documents. After all, it is merely one of the numerous species of evidence. Since it is nothing but evidence, it is subject to the rules of evidence. The fact that it is a deposition vouches for its authenticity, but its proponent still must demonstrate that it contains something which is material. The mere fact that it is a deposition no more vouches for its materiality than does the certificate affixed to a public document vouch for the latter's materiality. When the trial judge and the respondent's counsel made their inquiries concerning materiality, appellant's counsel should have put his finger upon the part which he deemed material. It is obvious that he would have been afforded opportunity to read that part. Other parts were immaterial

and, therefore, subject to that objection. This assignment of error is without merit.

■ The fourth assignment of error is based upon a ruling which permitted Mrs. Pierce to testify that in the room occupied by Mrs. Berkshire in the Monmouth Hotel she saw some neckties and a pair of men's bedroom slippers. The objection offered to this testimony was "irrelevant and immaterial." It will be recalled that the appellant took Mrs. Berkshire to Independence June 15 and that she spent that night in the Monmouth Hotel. Neither she nor the appellant disclosed where he spent that night, but his own counsel asked him questions which implied that Mrs. Berkshire stayed that night with somebody. The questions were parried but not answered. As a witness, the appellant professed inability to say whether or not his personal effects were in the room of the woman whom he called by the endearing name of Dolly and upon whom he bestowed lovepats. We do not believe that the answers the witness gave were immaterial or irrelevant.

■ The fifth assignment of error is based upon testimony given by Mrs. Pierce indicating that at the close of the insanity hearing Mrs. Berkshire "went to Mr. Harem's son, Fred Harem, and put her arms around his neck and kissed him." The issue occurred upon a motion made by the appellant after the testimony had been given, to strike it "as irrelevant and immaterial." We have mentioned the fact that the appellant attended the hearing in company with his son and that at its close Mrs. Berkshire did not embrace her own children but gave her affection to the appellant's son. The basis of this case is a charge that the appellant wrongfully alienated from the respondent the affections of his wife and thereby deprived him of his

conjugal rights. The fact, if it is one, that the appellant succeeded in gaining for himself and even for his son the love of the respondent's wife, although it does not prove wrongful conduct, shows that the appellant gained that which the respondent lost. It establishes one element of the case. We do not believe that the ruling discloses error.

The sixth assignment of error is based upon a ruling which refused to strike out the testimony given by Mrs. Ruby David, summarized in a preceding paragraph. Her testimony shows that the appellant, who was acquainted with Mrs. David and who knew that she wished to employ a maid, called upon her in May, 1945, with the information that he knew of a competent domestic who was seeking employment, and that shortly Mrs. Berkshire appeared. Mrs. Berkshire remained in Mrs. David's service until July 1 when she re-entered the appellant's employ. In the meantime, the respondent discovered the whereabouts of his wife and called upon her. Later, two of his children paid their mother a visit in the David home and while there saw the appellant appear at their mother's bedroom window, rap upon it, be admitted and then embrace their mother.

Mrs. David's testimony was capable of showing that the appellant displayed an interest in the respondent's wife which could be deemed inordinate. Men generally do not make unrequested calls at homes with recommendations concerning domestics. The appellant's interest in getting employment for Mrs. Berkshire possibly was on a par with the interest which prompted him to take her to a dance, to dinner, to motion picture theaters and upon automobile rides. He claimed throughout that his labor situation was diffi-

cult. Mrs. David's testimony was capable of proving that his interest in Mrs. Berkshire was not of the employer-employe type; in fact, it could warrant a conclusion that he had a surplus of help. Again, Mrs. David's testimony gave a background for the testimony given by the respondent in which he described the manner in which he discovered his wife's whereabouts and the testimony given by the children in which they narrated the early morning visit the appellant made to their mother. All of this testimony, in our opinion, was material. This assignment of error lacks merit.

■ The seventh assignment of error is based upon a part of one of the answers which Mr. Bergman gave in his deposition. The regularity of the latter is not questioned, nor does the appellant offer any objection to the question which elicited the answer. Mr. Bergman was a resident of Florida when his deposition was taken. The challenged part of the answer follows:

"During my conversation with Mrs. Berkshire and while I was endeavoring to influence her to return to Eugene for the purpose heretofore stated, Mr. Harem overheard part of said conversation and endeavored to persuade Mrs. Berkshire to remain in the hotel, saying he needed her there, saying he did not know how he could get along without her."

The question which brought forth the answer was:

"If you had such conversation and if Mr. Harem was present, state in some detail what was said in your conversation with Mrs. Berkshire."

After the question was read, the appellant's counsel declared:

"There is no objection to that question, your Honor, but there is an objection to the answer given because of conclusions and opinions expressed."

The trial judge, after reading the answer, marked off a part of it with parentheses, and then ruled:

"The part that I put parentheses around, don't read. I have tried to eliminate certain conclusions."

Thereupon the part of the answer which we quoted was read to the jury.

As a witness, the appellant conceded that Mr. Bergman spoke to him in the following vein when he made his visit:

"He says, 'Do you have any objection?' 'Well, no,' I says, 'I don't have any objections,' I says. 'It kind of leaves me in a tight spot right now because,' I says, 'Mrs. Layton, the other maid, is off on a vacation, and she told Mrs. Layton she would try to do all the work while Mrs. Layton was away on this vacation.'

"Q. Was that a fact?

"A. That was a fact.

"Q. You told Mr. Bergman that?

"A. I did.

"Q. And then go ahead with your conversation.

"A. Mr. Bergman said, 'Oh,' he says, 'you will get by all right.' He says, 'You got enough ability,' he says, 'to get by.' 'Why, sure,' I says, 'I will get by'."

Then Mr. Bergman turned his attention upon Mrs. Berkshire and presently persuaded her to return home. The appellant conceded that he overheard a large part of the conversation which passed between the two, and, as a witness, gave the substance of it.

We do not believe that the attacked part of Mr. Bergman's answer was nothing more than an expression of a conclusion. It is true that he employed the words "endeavored to persuade Mrs. Berkshire to remain", but he followed them immediately with "saying he needed her there, saying he did not know how

he could get along without her." Analytical minds which insist that every man talk in terms of stiff logic possibly would construe the phrase "endeavored to persuade Mrs. Berkshire to remain" as the expression of an opinion, or, to be more accurate, they would deem it an interpretation of the appellant's purpose. But those familiar with the ordinary habits of men know that most of us are prone to employ handles to our remarks, especially when called upon to repeat something which is so dim in our recollection that we struggle for a moment until our memory clears up. The handle gets us started. We think that the jury must have understood Mr. Bergman's answer as a statement that when he was pressing Mrs. Berkshire to return home, the appellant was dwelling upon his difficult labor situation and his need for her services. As her employer, he had a right to engage in such remarks. The answer ascribed no wrong to him. We can not hope to achieve perfection of narrative from the witness box as long as the source of testimony remains in human beings. The jurors know that fact and constantly see the trial judge strive to mould the witnesses into the difficult pattern set by the rules of evidence. It is our belief that this assignment of error affords no occasion for holding that substantial error was committed.

■ The eighth assignment of error is based upon a question in Mr. Bergman's deposition which asked him: "Did Mr. Harem at any time, in your presence, urge Mrs. Berkshire to return to her home and family?" The question met with the objection: "Irrelevant and immaterial; no duty upon the part of Mr. Harem to urge her." The objection was sustained to all parts of the answer except the word "no".

Of course, the appellant owed no duty to urge a

reconciliation. The burden was upon the respondent at the trial, not only to prove that the appellant caused the respondent to lose the affection of his wife, but also to prove that the appellant's action was prompted by malice. The instructions to the jury employed the term "intentional and malicious." The question under consideration dealt with the very moment when Mrs. Berkshire decided to return home, packed up her belongings and left the appellant. He was present at that crucial moment, and, had he advised her to take that course, his defense would have been virtually complete. Manifestly, the purpose of the question was not to indicate that he owed a duty to advise her to return home, but to draw out from the witness whether the appellant was the cause of her action. We think the question was material, and find no merit in this assignment of error.

The ninth assignment of error is based upon the following question which the deposition propounded to Mr. Bergman:

"Did Mr. Harem, while you were present, and in your hearing, express his approval of Mrs. Berkshire's going to her home?"

The objection was the same as to the question which is the basis of the eighth assignment of error. The answer was, "He did not." Based upon the same reasoning we employed in passing upon the eighth assignment, we hold that this assignment of error possesses no merit.

■ The tenth assignment of error is predicated upon the following question which was propounded to Mr. Bergman by the deposition:

"If your last answer is in the affirmative, state what or whose bedroom, or bedrooms, he pointed

out and state what, if anything, he told you about those bedrooms.''

The objection was:

"I object to part of the answer, your Honor, as being not responsive and a conclusion."

The answer was:

"He pointed out a door leading off the hall as being the door to the bedroom occupied by Mrs. Berkshire and also the door leading off the same hall, and on the same side, leading to his bedroom. He, Mr. Harem, said that there was no connecting door between his room and Mrs. Berkshire's room, they being adjacent. From where I was standing, however, I could see that the bed in his room had been disturbed but hers had not."

Before considering the propriety of the challenged ruling, we shall mention the eleventh assignment of error. It is based upon the following question and answer in Mr. Bergman's deposition:

"What did you observe as to the condition of each bedroom, and specify, by stating whose bedroom or bed was in the condition that you described, and how you know whose bed or bedroom was in the condition you described?

"A. I saw, as above stated, that the bed in his room had been disturbed, as if someone had recently used it for rest, but her bed was made up and had not been used."

The objection to that question was "irrelevant and immaterial, particularly the answer."

The complaint, among other averments, charged that the appellant "seduced said wife." We believe that the answers given by Mr. Bergman, and challenged by these two assignments of error, were material to

the charge made by the three words just quoted. It may be that the latter part of the first answer was not responsive, but the second question called for that part of the answer and cured the error.

We dismiss these two assignments of error as lacking in merit.

■ We shall now consider the first assignment of error. It is based upon the ruling which denied the appellant's motion for a nonsuit. The appellant, as we have seen, did not rest upon his motion, but presented evidence after it was overruled. Although the introduction of evidence by a defendant after his motion for a nonsuit has been overruled is not deemed a waiver of the motion, nevertheless, if any of the evidence which he presented is favorable to the plaintiff, it may be considered by this court in determining whether error was committed when the nonsuit was denied: *Johnson v. Underwood,* 102 Or. 680, 203 P. 879.

■ *McKinnon v. Chenoweth,* 176 Or. 74, 155 P. (2d) 944, *Coates v. Slusher,* 109 Or. 612, 222 P. 311, and *Pugsley v. Smyth,* 98 Or. 448, 194 P. 686, so carefully analyzed the elements of a cause of action for alienation of affections that we need go no further for present purposes than quote a paragraph or two from those decisions. In the Pugsley decision, it is said:

"Stated broadly, the rule is that the third person's conduct must have been the intentional cause of the loss suffered by the injured spouse. The conduct of the third person need not be the sole cause, but it is sufficient if the third person's conduct was the controlling cause which produced the estrangement, although there may have been other contributing causes. It is not necessary for the husband to prove the debauchment of his wife, nor is it essential that there shall be a physical separation of the spouses. If, however, the element of

seduction or adultery is not present, the general rule is that a third person is not liable for alienation of affections unless he acted maliciously or from improper motives implying malice in law."

■ We take the following from *Saxton v. Barber*, 71 Or. 230, 139 P. 334:

"While mere opportunity to commit adultery is not sufficient to establish this offense, still the law does not require that plaintiff prove the connubial relation by direct testimony. If it were necessary to prove the charge of sexual intercourse by direct testimony, seldom indeed would the charge be ever substantiated, for participants in that indulgence carefully keep the light of their wrong hid under a bushel and it is only by the invocation of the rule permitting the admission to the jury of circumstantial evidence that sexual gratifications of that character can be proved."

Although the appellant swore that his conduct toward Mrs. Berkshire was at all times proper and that the two never occupied the same bed, we believe that evidence above reviewed is capable of supporting findings that his conduct toward her was lustful and that adultery took place between them. If we confine ourselves only to the evidence concerning what occurred before this action was filed we find a man who insisted upon living behind locked doors with another man's wife. He called that woman by the endearing name of Dolly, and, in the presence of her sister, bestowed little lovepats upon her. His conduct was so brazen that he embraced her in the presence of her little children after his early morning rappings upon her bedroom window had gained him admittance. He knew that the woman to whom he was showing attention had been the object of an anxious search by her sister, her children and her husband. And, although he was aware

of the fact that answers given by him in his Eugene hotel had prolonged the search, he took this woman to his Independence hotel shortly after her husband had finally located her in the David home to which he had sent her. There, in the Independence hotel, they lived in an apartment behind locked doors in a manner that had the outward appearance at least of husband and wife. A half hour of lusty knocking upon the door was required to arouse them when the respondent again located his wife. Upon coming to the door, the appellant threatened the respondent with violence if he went back to the bed chamber. When the respondent's wife appeared, she was buttoning her dress and arranging her disheveled hair.

No juror is expected to think differently in the jury room than he does as a man in his home. The jurors had a right to deduce from the above-reviewed evidence what attributes of Mrs. Berkshire attracted the appellant and moved him to threaten the respondent with physical violence when he sought to reclaim his wife. After the jurors had reached a conclusion upon that issue, they could next infer what took place behind the locked doors at night. If the jury believed that carnal intercourse occurred back there, its finding was supported by evidence which showed that this man and woman had opportunities to perform acts of that kind, and that the appellant had many times manifested toward Mrs. Berkshire an adulterous inclination. In other words, the jury's finding, if it made one of that kind, was not lacking in evidentiary support. We dismiss this assignment of error as without merit.

The twelfth assignment of error challenges an instruction to the jury which told that body:

"If the plaintiff shall have established by a preponderance or outweighing of the evidence that

the defendant Harem and the plaintiff's wife sustained carnal sexual intercourse, it would not be necessary for plaintiff to establish malice \* \* \*."

The appellant does not criticize the instruction as a correct statement of the legal principle, but says:

"The evidence was wholly insufficient to justify the submission of the question of adultery to the jury."

In our consideration of the assignment of error, which is based upon the motion for a nonsuit, we held that the record contains sufficient evidence to support a finding of adultery. We, accordingly, hold that the instruction was proper.

■ The thirteenth, being the last, assignment of error, is predicated upon an instruction to the jury which declared:

"I instruct you that in this case it is not material to the issues as to how much or how little affection existed between Mr. Berkshire and his wife before her affection was alienated or interfered with by the defendant, if you find that it was interfered with by the defendant. Even the lack of affection is no complete defense to the action. Where one spouse has no affection for the other, a third party has no right to interfere or cut off the chance of an affection developing in the future as between a man and wife lawfully wedded. The one spouse has a right to the possibility of regaining the conjugal society and affection of the other spouse, and a third person has no right to intermeddle between them even though they are estranged; however, these are matters which you would be entitled to consider in measuring the amount of damages that the plaintiff has sustained, if you find that he has sustained damages in this case."

Every contention made by the appellant in support of this assignment of error was considered in the recent decision entitled *McKinnon v. Chenoweth,* supra. Based upon that decision, we hold that this assignment of error lacks merit.

The judgment of the circuit court is affirmed.