Argued April 1; affirmed May 2, 1947

# PATTERSON *v.* SKOGLUND

(180 P. (2d) 108)

*William B. Murray,* of Portland (with Thomas R. Mahoney, of Portland, on brief), for appellant.

*Ashley Greene,* of Portland, for respondent.

Before ROSSMAN, Chief Justice, and LUSK, BELT, BAILEY, HAY and WINSLOW, Justices.

### HAY, J.

Mrs. Dollie G. Patterson brought this action against Mrs. Doretta Pearl Skoglund, seeking damages for alienation of the affections of plaintiff's husband.

The complaint recites that, beginning on or about November 15, 1943, while the Pattersons were living together happily as man and wife, the defendant, with knowledge of such marital relationship, by a calculated and malicious course of conduct alienated from plaintiff the affections of her husband, and caused him to desert and abandon her, whereby she was deprived of his conjugal affection, society and aid. Specific means are alleged to have been employed by defendant, in-

cluding gifts of money, clothing, jewelry, and alcoholic beverages; the use of an expensive automobile; inducing the husband to accompany defendant to dances and other "places of entertainment"; purchasing an expensive home and furnishing it elaborately for his comfort and entertainment; and inducing and enticing him to desert and abandon plaintiff and to leave her without support or means of protection. Further, it is alleged that defendant has large financial means, and is the owner of real and personal property of a value in excess of $25,000, and that, in furtherance of her aforesaid malicious purposes, defendant has promised plaintiff's husband "a life of ease and pleasure in the enjoyment and use with her of her wealth and of said property". Plaintiff demands $15,000 in compensatory damages and $10,000 in exemplary damages.

The defendant answered by general denial.

Trial by jury resulted in verdict and judgment for plaintiff for general damages in the sum of $6,500. Defendant appeals, assigning as error the refusal of the court to allow motions which she interposed for involuntary nonsuit, for directed verdict, for judgment notwithstanding the verdict, and for a new trial.

■ The only error which has been argued upon this appeal is that there was a lack of evidence sufficient to support the verdict of the jury. The evidence, stated most favorably from plaintiff's point of view (*Berkshire v. Harem,* —— Or. ——, 178 P. (2d) 133), is as follows:

Mr. and Mrs. Patterson were married in 1916. They are the parents of a son, aged 27 years, of a daughter, aged 17 years, and of another daughter who died in infancy. Except for a brief separation which took place about four years after their marriage (and which

does not appear to have had any bearing upon the present controversy), their married life was for the most part normally amicable. The plaintiff described it as having been "very happy and very loving and affectionate". Their financial circumstances were modest. Mrs. Patterson helped support the family by keeping boarders. For over twenty years, Mr. and Mrs. Patterson never had a very serious quarrel. Early in 1941, however, they did quarrel, for the reason, as Mrs. Patterson said, that her husband had "stepped out with another lady", and had been drinking and "going out evenings". The quarrel was not confined to words, as Mr. Patterson admitted having slapped his wife "once", and, on two or three occasions, the police were called in, presumably to restore peace. Mrs. Patterson consulted an attorney, and, at the attorney's suggestion, Mr. Patterson, as a temporary expedient to promote domestic tranquillity, took up his residence away from home. During this separation, however, he came to the family residence frequently, tended garden, worked around the place, and sometimes stayed overnight. Mrs. Patterson said that he was at that time interested in another woman (not the defendant in this case, however.) Moreover, on several occasions, he attended dances with still another woman, and Mrs. Patterson heard of this and resented it.

Mr. Patterson returned to his home in September, 1942, and the couple resumed their conjugal relations, and lived happily together until October, 1943. At about that time, Mrs. Patterson underwent a serious surgical operation, and, while she was in the hospital recuperating therefrom, Mr. Patterson was considerate and attentive, coming to see her almost every night.

The Pattersons were socially inclined, and made a practice of attending public dances. This practice

was interrupted by Mrs. Patterson's hospitalization, but was resumed in or about December, 1943. At one of these public dances, in December, 1943, or January, 1944, Mr. Patterson made the acquaintance of the defendant, Mrs. Skoglund. At subsequent dances, over a period of some months, he danced with Mrs. Skoglund frequently. He did not introduce her to his wife, but, except for that fact, there was no outward impropriety. Feeling hurt and humiliated because he "would not introduce" her "to his friends", Mrs. Patterson ceased accompanying her husband to these dances.

Mrs. Skoglund is a widow, and is the mother of two children, one of whom, a son, lost his life in the late war while a prisoner of the Japanese. She was aware that Mrs. Patterson was jealous of her husband, as Mr. Patterson had told her that, whenever he introduced his wife to anybody (presumably, any woman), she would always make trouble and try to find out "what they knew about him".

The daughter of Mr. and Mrs. Patterson testified that, in December, 1943, or January, 1944, her parents "could not get together". Mr. Patterson "would go out", and started going out with Mrs. Skoglund. On two occasions, she observed Mrs. Skoglund's car in front of the Patterson home, and once saw Mr. Patterson enter the car.

On April 30, 1944, an argument developed between the Pattersons regarding a dinner engagement which Mr. Patterson said he had. During the argument, Mrs. Patterson told him, "Darling, maybe you better let her feed you all the time." Mr. Patterson thereupon left home and never came back. He himself testified that he separated from his wife because, since 1940, there had been between them "frequent marital trou-

ble'', jealousy, nagging and ''one thing and another'', and because of his wife's ''insinuations about women I knew''. He said that Mrs. Skoglund had nothing to do with his leaving. He added that the final separation was caused by Mrs. Patterson's own ''misconduct with other men'', and that her conduct, and nothing else, alienated his affections. The ''misconduct'' referred to consisted of the fact that at one time, while (according to Mrs. Patterson) Mr. Patterson was having an affair with another woman, Mrs. Patterson, for about a couple of months, ''went out'' with her supposed rival's fiance. She did so, she said, at the fiance's suggestion, thinking to make her husband jealous, but the experiment did not have the desired effect.

Early in May, 1944, Mr. Patterson planted a lawn for Mrs. Skoglund at her home. Mrs. Skoglund was employed in one of the county offices, and was not present while Mr. Patterson was doing this work, but she gave him a key to the house, so that he could go in and change into his work clothes. She paid him $60 for the job. Early in June, 1944, he took up residence in Mrs. Skoglund's home as roomer and boarder, for which he paid $40 a month, besides cutting the lawn.

In August and September, 1944, Mr. Patterson worked at the Patterson home, painting the house. While he was there, as his wife testified, a woman frequently called him on the telephone. At that time, Mrs. Patterson had not met Mrs. Skoglund, but later, when she was introduced to her, she recognized her voice as that of the woman who had so often telephoned Mr. Patterson.

Mr. Patterson and Mrs. Skoglund occasionally had lunch together down-town, Mrs. Skoglund paying for

her own meal. These luncheon meetings, Mrs. Skoglund said, were casual and not prearranged.

During the Labor Day week-end of 1944, Mr. Patterson and Mrs. Skoglund, in the latter's automobile, took a trip to Gig Harbor, Washington. They stayed one night at Mrs. Skoglund's daughter's home at Gig Harbor, occupying separate bedrooms. Mrs. Skoglund slept with her daughter. The trip extended from Saturday to Monday. Mrs. Skoglund, in her testimony, definitely gave the impression that they stayed at her daughter's house on both nights, but her daughter said that "they just came down overnight and went home the next day".

On May 6, 1945, the Patterson's daughter was married, being given in marriage by her father. There was a reception after the wedding, and some difficulty arose over procuring delivery of the wedding cake to the place where the reception was to be held. Mr. Patterson volunteered to get a car and fetch the cake. He procured Mrs. Skoglund's car for that purpose, with Mrs. Skoglund as driver. Mrs. Skoglund attended the reception. She testified that she was invited, but did not say by whom. Up to that time, Mrs. Patterson and Mrs. Skoglund had not met, but, on that occasion, Mr. Patterson introduced them, and Mrs. Patterson thanked Mrs. Skoglund for bringing the cake. Shortly thereafter, Mrs. Skoglund called Mrs. Patterson by telephone several times, and, on each occasion, complained that people had been telephoning her inquiring whether Mr. Patterson was living with her. She protested to Mrs. Patterson that he was not, and invited her to visit Mrs. Skoglund's home and see for herself. Mrs. Patterson, accompanied by a woman friend, did visit the home, and found Mr. Patterson there. He

was in the kitchen, standing by the sink and partaking of a drink of water. His breath was "alcoholic". He said to his wife: "I was expecting you." Mrs. Patterson asked Mrs. Skoglund why she had lied when asked if Patterson was living with her. Mrs. Skoglund denied that she had lied, and said: "He was not here at that time." Mr. Patterson then accused Mrs. Patterson's friend with having come there "as a witness". Mrs. Patterson insisted upon being shown through the house, saying: "I want to see how comfortable you are." Mr. Patterson said: "Get the hell out of here", and "began shoving". Mrs. Patterson admitted that on this occasion she struck Mr. Patterson on the head with a vase. She said: "It straightened him up a little bit."

Mrs. Blanche Matson testified that Mr. Patterson boarded in her home from October, 1944, to July, 1945. Shortly after he went there, Mrs. Skoglund called on him. They had a conversation about some work that she wanted Mr. Patterson to do. He didn't want to do the work, and Mrs. Skoglund told him: "This is not the end." He offered Mrs. Skoglund a key, saying that he had forgotten to leave it with her, but she did not take it. Mrs. Skoglund's explanation of this incident was that she wanted Mr. Patterson to repair some "bad spots" in the lawn which he had planted for her.

In July, 1945, Mrs. Skoglund sold the house in which she had been living, and purchased another. Mr. Patterson helped her in moving into her new home, and resided there with her for about three weeks. She introduced him to a Mr. and Mrs. Dietrich, the persons from whom she purchased the house, saying: "This is my fiance, Mr. Patterson." Mr. Dietrich

testified that Mr. Patterson said to Mrs. Skoglund on that occasion: "Honey, this is a nice garden we will have this summer."

Mrs. Skoglund specifically denied ever having enticed Mr. Patterson away and induced him to come and live with her "by means of presents of money". She denied having given him jewelry, clothing, ties or shirts, or an automobile. She denied having maintained a home for him, denied having been in love with him, denied expecting to marry him, and denied having consciously done anything to induce him "away from the loving arms of his wife."

 It is contended that the specific allegations of plaintiff's complaint take precedence over the general allegations therein regarding the same matter. The complaint required the defendant to meet certain specific charges of misconduct, and it is argued that, to recover, it was necessary for plaintiff to have established one or more of such specific charges. It is true that a complaint in this kind of action must conform to the general rules of pleading. 42 C.J.S., Husband and Wife, section 686. Under such general rules, where both general and specific allegations are pleaded respecting the same matter, the latter usually control. *Morton v. Wessinger,* 58 Or. 80, 84, 113 P. 7; *Cosgrove v. Tracey,* 156 Or. 1, 12, 64 P. (2d) 1321. The complaint, however, contained allegations of ultimate fact which, by themselves, were sufficient to constitute a cause of action for alienation of affections. These allegations were, in effect, that at certain stated times, while plaintiff was residing with and being supported by her husband as his wife, and was enjoying his affection, protection and respect, the defendant, well knowing such facts, and wrongfully intending to deprive plaintiff

of her husband and of his support, aid, society and protection, wilfully, wickedly and maliciously sought his affections, "and to induce and persuade him by presents of money, jewelry, (and) clothing, to leave plaintiff without support and go with the defendant, and consort and spend his time with the defendant". In cases of this kind, wherein the means used by the defendant to accomplish her purpose are usually within her knowledge much more than that of the plaintiff, it is sufficient if the complaint states the ultimate facts constituting the cause of action. Here, the specific allegations were not adduced in support of the charge of alienation of the husband's affections, but rather were alleged as the means employed by defendant to induce and persuade the husband to *leave* plaintiff and to consort with defendant. Actual physical separation of the husband from plaintiff was not essential to the right of action. 42 C. J. S., Husband and Wife, section 667. The complaint goes on to allege specific actions by defendant "in furtherance of her * * * purpose to persuade and entice" plaintiff's husband to leave her and to consort with defendant, and says that defendant "induced and unlawfully and maliciously enticed" the husband "to desert plaintiff * * * and to take up his home and reside with the defendant and" that he "is still residing with the defendant as a result of her enticing and blandishments".

The gist of the action, as defendant concedes, is (1) wrongful conduct of the defendant; (2) loss of affection or consortium; and (3) a causal connection between such conduct and such loss. 27 Am. Jur., Husband and Wife, section 523. A complaint which alleged the fact of the marriage relation of plaintiff and her husband, and charged that "the defendant wrongfully and wantonly and maliciously persuaded plaintiff's

husband to leave home and abandon her and her children and to continue to live separate and apart from them'', and thus deprived plaintiff of the comfort, society, and assistance of her husband, was held, in *Bird v. Ellingsworth,* 156 Or. 103, 59 P. (2d) 261, 65 P. (2d) 674, to state a cause of action for alienation of affections, as against a contention that it stated only ultimate facts and should have set out with particularity wherein and how the defendant alienated the husband's affections. The specific allegations of the complaint herein, therefore, may be considered as surplusage, and may be disregarded. The statement of the ultimate facts of the marriage, the alienation, and the separation, was sufficient, without pleading the acts done and artifices used to accomplish the result. Bancroft, Code Pleading, section 21, p. 55.

" * * * The ultimate fact which is constitutive of the cause of action in this case is that of wrongfully inducing the husband of plaintiff to abandon her. The methods adopted to accomplish that purpose are mere matters of evidence, from which the ultimate fact is proved, or may be inferred. Various methods may have been adopted to accomplish the purpose, and a denial of them, if stated, would not form a single issue involving the whole remedial right. They would be probative, and not constitutive, facts. In the opinion of the jury, an inference that defendants wrongfully induced plaintiff's husband to leave her might not be drawn from one or more acts proved, but might readily be drawn from them all, taken in the aggregate. No issue could therefore be made upon each act and statement of defendants that would conclude the right of plaintiff to recover. Wrongfully inducing plaintiff's husband to abandon her is a conclusion of fact, depending upon the proof of acts, declarations, and conduct of defendants. It is not a conclusion of law, but a fact from which a legal

conclusion is to be drawn. * * *" *Nichols v. Nichols,* 134 Mo. 187, 35 S. W. 577. See also *Nevins v. Nevins,* 68 Kan. 410, 75 P. 492; *Warnock v. Moore,* 91 Kan. 262, 137 P. 959; *Woodhouse v. Woodhouse,* 99 Vt. 91, 130 A. 758, 768.

■ It is argued that, because the court, on motion of defendant, struck from the complaint the words "and otherwise" from an allegation reading: "* * * and to induce and persuade him (the husband) by presents of money, jewelry, clothing and otherwise", etc., confined the issues to the matters specifically mentioned in the complaint. If, as we suppose, this contention implies that the court's action had the effect of confining plaintiff to proof of the specific allegations of the alleged means employed by defendant, and deprived her of reliance upon the allegations of ultimate fact constituting the cause of action, it cannot be sustained. As heretofore stated, the specific allegations were surplusage, and a modification thereof was merely a modification of surplusage.

■ In order to establish her case, it was necessary for the plaintiff to show by substantial evidence that, in alienating the affections of plaintiff's husband, defendant acted maliciously, and with intent to produce the result upon which the action is founded. *Pugsley v. Smyth,* 98 Or. 448, 194 P. 686; *Roberts v. Cohen,* 104 Or. 177, 206 P. 293; *Hughes v. Holman,* 110 Or. 415, 223 P. 730, 31 A.L.R. 1108; *Bradford v. Bradford,* 165 Or. 297, 107 P. (2d) 106. Malice, in this connection, is the intentional doing of a wrongful act without cause or excuse. *Schneider v. Tapfer,* 92 Or. 520, 180 P. 107; *Noll v. Carlin,* 101 Or. 203, 199 P. 596; *Bradford v. Bradford,* supra. Although Mrs. Skoglund was informed by Mr. Patterson that his wife was extremely

jealous, nevertheless, in Mrs. Patterson's presence, she accepted his marked attentions at public dances. She telephoned him frequently at his home. She received him into her home as a roomer and boarder, she and he being the only occupants of the house, and he, to her knowledge, being a married man with a jealous wife. She permitted him to remain in her home over the vigorous protests of his wife. When asked by Mrs. Patterson whether or not she was "going with" Mr. Patterson, she answered, with only slight evasion, "You might expect him to be going with others if he is not staying at home." She took Mr. Patterson on a three-day trip into Washington. She addressed him, on occasion, in terms of endearment, and introduced him to strangers as her fiance. These facts, in our opinion, made a case from which the jury may have found that the defendant's conduct was wrongful and intentional, and, therefore, malicious. The question was one for the jury. *Roberts v. Cohen,* supra.

 It is argued that the evidence did not show that defendant was the active or aggressive party—the pursuer rather than the pursued—in the relations between her and plaintiff's husband, and that, in the absence of such showing, plaintiff failed to make a case for the jury. 42 C.J.S., Husband and Wife, section 670, and cases cited. The evidence, however, does not show that the defendant was merely a passive recipient of the attentions of plaintiff's husband. On the contrary, the evidence was such that the jury may have believed therefrom that she was actively and aggressively bent upon winning Mr. Patterson's affections, that she did so, and that her actions were the controlling cause therein. Under the rule in Oregon, in order to hold a defendant liable in a case of this kind, her actions must

have been the controlling cause of the alienation, but they need not have been a sole cause. *Disch v. Closset,* 118 Or. 111, 244 P. 71; *McKinnon v. Chenoweth,* 176 Or. 74, 155 P. (2d) 944; *Berkshire v. Harem,* supra. The charge of the court in the case at bar properly instructed the jury upon this point, and no exception was taken thereto. The evidence was sufficient to make a jury question.

■ The defendant contends that the evidence indicates that plaintiff acquiesced in and consented to the relationship which arose between defendant and plaintiff's husband, and, therefore, that, under the authorities, plaintiff cannot recover. *Fuller v. Robinson,* 230 Mo. 22, 130 S. W. 343, Ann. Cas. 1912A, 938; *Kohlhoss v. Mobley,* 102 Md. 199, 62 A. 236, 5 Ann. Cas. 865; 27 Am. Jur., Husband and Wife, section 539. In the Fuller case, the court instructed the jury that their verdict should be for the defendant, if they believed from the evidence that the plaintiff permitted or connived at, or consented to or encouraged the attention and conduct of the defendant toward plaintiff's wife. It was held that the instructions on this head were as favorable as the defendant had a right to ask, if not more so. The Kohlhoss case was an action for criminal conversation, the plaintiff being the husband. The evidence—indeed the plaintiff's own testimony—indicated a generally complaisant and acquiescent attitude on the part of the plaintiff husband toward his wife's affair with the defendant, and that, in addition, he not only consented to, but assisted in bringing about an assignation between them. This conduct on his part was held to debar him from recovering damages. The court said, in part:

"The facts * * * cannot fail to prove to any reasonable mind such a course on the part of the

plaintiff, both before and after the time at which he states that his suspicions as to his wife's chastity were aroused, of indifference to and acquiescence in the habitual conduct and attitude of his wife and Mobley toward each other, as not only deprived her of his marital protection, but afforded to their incipient amour full opportunity to develop and mature into her complete dishonor. This line of conduct on the part of the plaintiff, who was not a stranger to his wife's weakness for other men, in reference to her liaison with Mobley, which was largely conducted under his own eyes, amounted in our opinion to such connivance as to effectually debar his right of recovery in this case. * * * "

There is nothing in the evidence before us to show consent or connivance by plaintiff in the acts and conduct of defendant. She was not required to make public protest against her husband's marked preference for the defendant's society at public dances. Her remark that her husband had better let his lady friend feed him all the time no doubt was intended as facetious, and could hardly have been regarded as a suggestion that he should leave plaintiff and take up his residence with defendant. There is ample evidence that, after Mr. Patterson went to Mrs. Skoglund's house to live, plaintiff protested vigorously both to Mrs. Skoglund and to him. There was no evidence of connivance or of acquiescence.

■ Evidence was received, over objection, that, during the period of the Pattersons' 1941-1942 separation, Mr. Patterson sent his wife certain verses of poetry, of a tenor indicating that at that time he held her in affectionate regard. The poems themselves were received in evidence. They were not original compositions by Mr. Patterson, but had been clipped or copied from various publications. One in particular, sent on

the Pattersons' twenty-sixth wedding anniversary, and entitled "Our Anniversary", was evidently intended to show continuing and ever-growing affection. The objection was that the verses were confidential communications between husband and wife during coverture. Section 3-104, O. C. L. A. They were identified by Mr. Patterson, on his cross-examination as a witness for defendant. They had been identified previously by plaintiff, as a witness in her own behalf in her case in chief, but were rejected upon defendant's objection that they were not binding upon defendant, and had no bearing upon any of the issues. Moreover, Mr. Patterson, upon being called by plaintiff as an adverse witness, expressly refused to waive his statutory privilege so as to permit his wife to testify as to communications made by him to her during coverture.

In Pugsley v. Smyth, supra, it was held that the statutory privilege extended to all communications whatever, and not only to communications of a confidential nature. This court, in *Coles v. Harsh,* 129 Or. 11, 276 P. 248, held that the statutory privilege is one personal to the husband or wife, and is not available to a third party. The defendant's objections to the introduction of the poetry in evidence in the case at bar were, therefore, properly overruled.

■ Notwithstanding the refusal of Mr. Patterson to waive his privilege, we hold that, by taking the witness-stand, later in the trial, as a witness for defendant, and testifying to these and other communications made to him by his wife during coverture, he waived his privilege effectively. *Coles v. Harsh,* supra; Wigmore, Evidence, 3d ed., section 2340, and cases cited.

■ There was no proof whatever of defendant's alleged wealth; as a matter of fact, she appears to be a

woman of very modest means, and has to work to support herself. As no exemplary damages were awarded against her, however, the failure of proof in this respect was immaterial. It must be conceded that the case made by plaintiff was not impressive, but it included competent evidence sufficient to carry it to the jury.

In our opinion, there was no error in the trial court's denial of defendant's motions. The judgment is affirmed, with costs.

WINSLOW, J., concurs in the result.