**STATE of Missouri, Respondent,**

v.

**Loren Linn BLEDSOE, Appellant.**

**No. 47110.**

Supreme Court of Missouri,

Division No. 1.

July 13, 1959.

Martin Anderson, Milton Abrams, Kansas City, for appellant.

John M. Dalton, Atty. Gen., W. H. Bates, Sp. Asst. Atty. Gen., for respondent.

WESTHUES, Judge.

The defendant Loren Linn Bledsoe was tried in the Jackson County Circuit Court on a charge of murder in the first degree and was found guilty of murder in the second degree. The jury was unable to agree upon a punishment and thereafter the trial court assessed defendant's punishment at life imprisonment in the State Penitentiary. He appealed from the sentence and has briefed only two points for our consideration. These points stated in defendant's brief (omitting citation of authorities) are as follows:

"1. That the Court erred in permitting the prosecutor, in both his opening statement and closing argument, to state to the jury that the defendant had killed his father-in-law and mother-in-law without a qualifying statement preceding or following that statement.

"2. That the Court erred in permitting the wife of the defendant to testify prejudicially against this defendant, this defendant not having

waived his statutory or constitutional rights, and over the defendant's objection."

Before considering the assignments of error, we shall make a statement of what the evidence showed to have occurred. On July 22, 1957, defendant and his wife with their small child were living in a basement apartment at 712 Olive Street, Kansas City, Missouri. The wife's father and mother, Ben and Anna Webb, were living in the same building in an upstairs apartment. That evening, Mr. and Mrs. Webb were in the living quarters of defendant. After an argument, Mr. and Mrs. Webb were shot with a .22 caliber rifle (a repeater). Defendant was tried in this case for the killing of Anna Webb. The evidence showed that defendant and his wife were married February 22, 1956. They lived together 90 days. Thereafter, defendant did not visit his wife and worked at various jobs in Kansas and Montana. In the meantime, a child was born to defendant's wife. In June, 1957, so defendant testified, he, for the sake of the child, returned to Kansas City and he and his wife lived together until the night of the shooting. Defendant blamed his mother-in-law for the separation and the evidence showed that defendant and his mother-in-law never could get along. On the evening of the shooting, defendant's wife had driven to a greenhouse where her mother worked to bring her home. While she was on this errand, defendant arrived home from work and found no one at home. He testified that no meal had been prepared; that the rooms were unclean and everything had been neglected. He further testified that as soon as his wife and mother-in-law arrived, the mother-in-law "jumped on" him. He stated that he had objected to his wife's going after her mother. To get an idea of how the defendant claimed the argument began, note his evidence:

"A. Well, the first thing she done, she was standing in the door with her finger in my face (illustrating), in-

forming me that Ruth had come out and picked her up and if I had anything to say to anybody about it to say it to her.

\*　\*　\*　\*　\*　\*

"Q. All right, sir. Go right ahead and then after she made this statement to you, what? A. Well, she was standing there, shaking her finger in my face (illustrating), and I just took my arm, kind of pushed her aside and went on in my apartment. I says, 'As long as you are around Ruth and talking to her the way you do, I won't be able to get along with her too good.' I went on in the kitchen and she came in there with her finger still giving me that (illustrating), and I finally got away from her and I walked from there and started out the west exit of the door and she kept coming at me, talking to me, I was going to do this and I was going to do that, finally my wife called her down on it, as she had done before, and she finally quieted down."

While this argument was going on, Mr. Webb came into the apartment. Neighbors were attracted by the loud argument and a Mrs. Joiner and her daughter, Mrs. Smith, testified they could see into the basement through a window that defendant had a gun and was pointing it in the direction of Mr. and Mrs. Webb. Soon a shot was heard, then Mrs. Webb was seen in the backyard. One witness testified he saw flashes from a gun while another testified that he saw defendant shoot at Mrs. Webb. It was found by an autopsy that Mrs. Webb was shot five times; that the cause of death was from bullet wounds of the neck, chest, and shoulder. Bledsoe was then seen walking toward his car. He was later arrested while driving near Kansas City; he had a rifle with him. The State also introduced evidence of threats made by the defendant. One witness stated that the defendant told him, " 'I have a good notion to kill the whole God damn works

of 'em—bunch—bunch of 'em.'" This is alleged to have been said on the evening of the shooting.

Defendant does not contend that the evidence was not sufficient to sustain a conviction. His version of what occurred was that while the argument was going on, Mrs. Webb said to her husband, "'Shoot him.' 'Shoot the bastard.'" Bledsoe stated that Mr. Webb picked up defendant's rifle "and he pointed it at me and I think I could see his finger tighten on that trigger." Defendant says that he grabbed the rifle and during the struggle for the gun, the rifle was discharged and about the same time Mrs. Webb struck him (defendant) on the back of the head with a brick which knocked him unconscious for a second or so. Defendant testified that he vaguely remembered what occurred after he was struck; that he saw his father-in-law stagger and fall; that Mrs. Webb had a brick and struck at him a number of times; that he managed to get out of the basement; that part of the time he was unconscious and blind; that after he got out of the basement, "I don't remember if I took one, two, three, four or six steps after I left but I remember her standing there and she had a maddog look on her face and she had a knife in her hand and she made a swipe at my throat, and I don't know, I do remember firing at her, at her hand, with that gun.

"Q. Do you remember distinctly firing at her? Tell the jury everything you remember. A. Well, I think I shot at her hand. I don't, I don't really remember pulling the trigger on that gun at all.

"Q. Where did you go immediately after that? Which way did you go, if you know? A. Well, I—I went to my automobile that was parked in the front of 712 Olive, across the street."

Defendant, while testifying, told of all the circumstances of the manner in which he claimed Mr. Webb came to his death. He stated that as he was leaving the base-

ment, he stepped over the body of Mr. Webb. He related in detail his version of all that occurred.

◼ What we have related is sufficient to dispose of the first point briefed by the defendant. The facts and circumstances of the killing of Mr. and Mrs. Webb were so closely connected and intermingled that it would be impossible to state the facts without disclosing that both Mr. and Mrs. Webb lost their lives. In these circumstances, it was not error for the prosecutor in his statement and argument to refer to the evidence that Mr. Webb had been killed.

We now approach a more serious problem. The second point briefed presents the question of whether the trial court erred in permitting the State to call the wife of the defendant as a witness in rebuttal. To understand the situation which confronted the trial judge at the time he ruled the wife of the defendant to be a competent witness in rebuttal, we must relate further facts as shown by the record. We stated previously that defendant objected to his wife's driving to the place where her mother worked to bring her home; that the wife did so was at least in part the cause of the argument on the evening of the shooting. After the State had rested its case, the defendant's counsel made a statement of what the defendant intended to prove. It was stated that defendant would testify that he had objected to his wife's going after her mother because the wife had told the defendant, after they were married, that before their marriage, she and her sister had had an affair with Negro men. Defendant claimed that one of these men was an employee where the mother was working. This was objected to by the State. Counsel for the defendant then stated, out of the presence of the jury, as follows:

"Mr. Anderson: The jury is entitled to know the motives behind the arguments as they occurred at the premises that evening. So far the State has submitted no motive, no excuse

for any argument, although they were given the opportunity to have presented the wife heretofore, to which we would have objected.

"The Court: To which you would have—

"Mr. Anderson: To which we would have objected, but nevertheless, the testimony was not submitted and in order to get all of the evidence to the jury as to the basis of the arguments prior to the time of the altercation and of the shooting, it is all in justice that this argument and basis therefore be presented to the jury.

"The Court: Objection is overruled."

Then, in the presence of the jury, the attorney for the defendant said, "As I was saying, that the reason he did not want his wife out there at Krahenbuhl's Nursery was because she had theretofore told him of acts of sexual intercourse with a Negro employee."

The defendant testified to the following facts:

"Q. What was that? A. My wife told me a bunch of things that she had did that I didn't know about before I married her.

"Q. What was that? A. Well, she admitted to me that she crawled in a car with two Negroes on the highway one night, her and her sister, and that they went out to Heart Drive-In Theater, and they had sexual relations with the Negroes there, her and her sister Lois, and after they left there they rented a tourist cabin at the U-Smile Tourist Court on old 40 Highway, and I believe she claimed she had this one Negro to take her on home and her sister stayed for the remainder of the night with these two guys there.

"Q. Did you tell that to the police officers on the night of July 22, 1957, that same statement in your alleged confession? A. Yes, sir.

"Q. And that was the reason why you were separated? A. Yes, sir.

"Q. Then how did it happen that you and she went back together then in June of '57? A. I hadn't seen my child after I had left, I went out west, I came back here for the purpose of seeing my child and to take care of it, and finally after I did get to see it I seen what kind of shape the child was in, what it was having to go through, and I just couldn't bring myself to desert it."

At the time the State called defendant's wife to testify in rebuttal, the defendant objected and after some discussion between the lawyers and the trial judge, the record shows the specific objection made by the defendant. Note what was said:

"The Court: Anything more?

"Mr. Schrader: No.

"The Court: Now your objection specifically is that she is not a competent witness under Section 546.260?

"Mr. Anderson: And under the Constitution of the State of Missouri, Article I, Section 19 [V.A.M.S.], the Constitution of the United States and under the common law of the State of Missouri or any known interpretation of any of those laws, and the defendant does not waive his option, nor does he consent to her taking the stand.

"The Court: Objection is overruled."

The correctness of that ruling depends upon whether defendant's wife

was a competent witness for any purpose. The rule of the common law, as well as the statute, that husband or wife may not testify against each other in a criminal prosecution, is based on public policy "which seeks to preserve the peace, confidence, and tranquility of the marital relation." 97 C.J.S. Witnesses § 266, and see cases there cited under Note 53, p. 763; also 97 C.J.S. Witnesses § 76, pp. 470–472. It is the rule in this state that a spouse may waive the protection of the common law and the statute by failing to object at the time the witness is called upon to testify. State v. Hill, Mo., 76 S.W.2d 1092, loc. cit. 1093, 1094(2–5).

■ We rule that defendant in this case by his own testimony revealed to the world an alleged confidential communication between him and his wife and by such evidence attempted to blacken her character and reputation to his own advantage and by doing so completely removed and destroyed the protection afforded him by the statute and the rule of the common law. Did the defendant by such evidence preserve the peace, confidence, and tranquility of the marital relation? The answer is obvious. The defendant by giving such evidence should not be permitted to take advantage of the statute. To permit him to do so would be contrary to all rules of justice. We rule that the defendant waived the privilege. Our ruling is supported by good authority. See 97 C.J.S. Witnesses § 310, pp. 861–863, and cases there cited.

The wife of the defendant was a competent witness in rebuttal for the State for the purpose of testifying with reference to the alleged confidential communication which her husband had revealed. Her testimony as to this was that she had never told her husband that she had had an affair with a Negro. On cross-examination, she testified that on one occasion she had trouble with her car and that her employer sent for her and her sister; that

a Negro drove the car and took them to work. She further testified that she had told her husband about that and nothing more.

When Mrs. Bledsoe was placed on the witness stand, she not only denied that she had told her husband about having an affair with a Negro but she was examined with reference to what occurred on the night of the shooting. Defendant had, prior to the time the wife testified, stated to the court that his objection should be considered as applying to each and every question asked of the witness. The witness was cross-examined as to all of these matters and in some respects the cross-examination went beyond the examination in chief.

As above related, defendant's attorney, before defendant's evidence was introduced, told the jury that the arguments between the parties on the evening of the shooting were over the fact that Mrs. Bledsoe, over her husband's objection, had gone to the nursery where her mother worked; that the reason was that a Negro with whom his wife had told him she had had an affair also worked at that place. Counsel stated to the court that the jury was entitled to know the motives behind the arguments; that the State had not shown a motive. Defendant testified that he purchased the rifle used in the shooting for protection; that, on the night of July 10 before the shooting, a Negro came into his room where he and his wife lived while the wife was away; that defendant was awakened and asked the Negro what he wanted; that the Negro said, " 'I am sorry,' he said, 'I used to come down here with a —' I believe he called the man's name Harold, 'to see Lois.' " Lois was a sister of defendant's wife. Defendant further testified that his wife and Lois had lived together at that place before he, the defendant, moved in to live with his wife. By this evidence, defendant accused his wife of having Negro visitors at night

shortly before her husband returned to live with her. Much of defendant's evidence pertained to matters which may be classified as confidential between husband and wife. In such circumstances, justice demands that the wife should be permitted to testify. We rule that defendant by his evidence destroyed the shield of the statute and waived his privilege or right to object to his wife's testifying. For cases supporting this ruling, see Swearingen v. Vik, 51 Wash.2d 843, 322 P.2d 876, loc. cit. 880(3, 4); White v. State, Oklahoma, Okl.Cr., 268 P.2d 310, loc. cit. 313, 314(2, 3); and Patterson v. Skoglund, 181 Or. 167, 180 P.2d 108, loc. cit. 115(16), wherein the Supreme Court of Oregon said, "Notwithstanding the refusal of Mr. Patterson to waive his privilege, we hold that, by taking the witness-stand, later in the trial, as a witness for defendant, and testifying to these and other communications made to him by his wife during coverture, he waived his privilege effectively. Coles v. Harsch, supra [129 Or. 11, 276 P. 248]; Wigmore, Evidence, 3d Ed., section 2340, and cases cited."

The State in its brief strongly urged that Mrs. Bledsoe was a competent witness against her husband because he was being tried for the murder of her mother. The State cites the case of State v. Kollenborn, Mo., 304 S.W.2d 855 (court en banc), and State v. Greer, Mo., 313 S.W.2d 711. We are not basing our ruling on those and similar cases. To do so would be extending the doctrine beyond any holding in those cases. If we were to consider the question of whether the present situation were controlled by those cases, it would be obiter dictum and we therefore decline to make any further comment on that question.

Matters of record not required to be preserved for review have been examined and we find no error therein.

The judgment is affirmed.

All concur.