**STATE of Missouri, Respondent,**

v.

**Emmett Lee PENDERGRAS, Appellant.**

**No. WD31954.**

Missouri Court of Appeals,
Western District.

July 28, 1981.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 25, 1981.

Robert G. Duncan, Duncan, Russell & Reardon, Kansas City, for appellant.

John Ashcroft, Atty. Gen., Kristie Green, Asst. Atty. Gen., Jefferson City, for respondent.

Before KENNEDY, P. J., and SHANGLER and WASSERSTROM, JJ.

WASSERSTROM, Judge.

Defendant appeals from a conviction for possession of marijuana and of cocaine. The sole issue for decision is whether the trial court properly permitted defendant's wife Deborah to testify over defendant's claim of spousal privilege. We affirm.

In November 1979, defendant and Deborah were estranged, and she had filed suit for dissolution of the marriage. The family home at that time consisted of a building containing living quarters and also a connected area which was in the course of being renovated for commercial use.

On November 11, 1979, defendant and Deborah became engaged in a violent argument, as a consequence of which defendant forced Deborah from the home. She immediately went to the police and told them that defendant had narcotics on the premises. Based on her affidavit, a search warrant was issued. Police proceeded to search the premises where they found quantities of marijuana, equipment customarily used in dealing with cocaine, and residues of cocaine remaining on that equipment. Police further proceeded to search a Lincoln automobile parked in front of the residence, where they found a box in the trunk containing a substantial quantity of marijuana.

Defendant took the stand and offered the following explanation for the presence of the controlled substances on the premises. He stated that as a result of arguments with his wife, he ceased living at the family home on approximately November 1 and that from said date until November 19, he lived at the apartment of his friend John Watson. During that period he made the Lincoln automobile available to his wife for her use and furnished her with a key for that purpose. He made some occasional use himself of the Lincoln during the 19 days period in question, but on the last day when he had occasion to look in the trunk, he did not see any box such as that later found by the police.

Defendant further testified that he returned to the home on November 19 and went to inspect the renovation work then in progress. As he looked into a box to check on materials being used for the renovation work, he discovered bags of marijuana. He says he immediately yelled for Deborah and demanded an explanation. Deborah declined to make any answer and instead ran away. Defendant testified that he then told Deborah he did not want her in the house nor did he want her to use the Lincoln any further, and he started gathering up her clothes and those of the children to expel her from the premises. He denied ever having or seeing cocaine or cocaine equipment on the premises, and he testified a satchel in which the police found marijuana and a cocaine test kit was a piece of luggage belonging to Deborah.

After defendant testified as outlined above, the prosecution called Deborah in rebuttal. She testified that defendant had not moved out of the home during the period November 1 to 19, but rather that he continued to live there together with her and the children. She testified that she had seen defendant with narcotics and using the narcotic equipment on the premises. She denied that defendant had ever given her a key to the Lincoln automobile and said

rather that defendant had the only key. She denied that the satchel in which the police found marijuana and the cocaine test kit belonged to her, and she testified that instead that satchel was owned and used by defendant.

With respect to the events on November 19, 1979, Deborah testified that she and defendant got into one of the violent arguments that were frequent between them, during the course of which defendant struck her and threatened to smash the skull of her daughter. It was at that point that Deborah says she resorted to the police, told them about narcotics being on the premises, and signed an affidavit for a search warrant.

Defendant objected to Deborah testifying on the ground of spousal privilege. The overruling of that objection is the only assignment of error made by defendant in his single Point Relied On.

Anglo-American law anciently recognized a privilege by a defendant in a criminal case to exclude any testimony against him by his spouse. That historic rule has long been subject to much scholarly criticism, and the growing trend of the case law is to limit and sharply restrict this privilege. The development of this trend and the reasons therefore have recently been fully set forth by the United States Supreme Court in *Trammel v. United States*, 445 U.S. 40, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980), in which the Supreme Court overruled its prior stand in *Hawkins v. United States*, 358 U.S. 74, 79 S.Ct. 136, 3 L.Ed.2d 125 (1958), and declined any further to permit a defendant from excluding his spouse from testifying, where no confidential communication is involved.

Despite the trend mentioned, Missouri remains in the diminishing ranks of the jurisdictions which continue to follow the an-

cient privilege. *State v. Euell*, 583 S.W.2d 173 (Mo.banc 1979).[1] Even after *Trammel* reached the opposite conclusion, the Missouri Supreme Court has continued to give effect to the rule stated in *Euell* (but only prospectively[2]). *State v. Shafer*, 609 S.W.2d 153 (Mo.banc 1980).

■■■■ Nevertheless, there is an exception to the privilege rule which prevents defendant from taking advantage of it. Where the accused testifies and in so doing casts aspersions upon his spouse in an endeavor to exculpate himself, then the defendant is deemed to have waived the privilege so that his spouse becomes free to testify in order to clear her reputation. This exception was recognized and applied in *State v. Bledsoe*, 325 S.W.2d 762 (Mo. 1959), where the defendant was charged with murder of his parents-in-law. The defendant testified that the argument started because he had objected to his wife picking up his mother-in-law at the latter's place of employment. He testified that he did not want his wife near that workplace because she had previously told him that she had had a premarital affair with one of the black employees working there. His testimony also accused his wife of having had certain nighttime black male visitors during a period when he was not living at home. Over defendant's objection, the State was allowed to call the wife in rebuttal. She not only denied that she had either had the affair or that she had told her husband of such an affair, but in addition she testified concerning the events of the shooting. In ruling that the wife was a competent witness, the *Bledsoe* opinion holds:

"We rule that defendant in this case by his own testimony revealed to the world an alleged confidential communication between him and his wife and by such

1. *Euell* relied heavily on *Hawkins* (overruled by *Trammel*) and declared that *State v. Frazier*, 550 S.W.2d 590 (Mo.App. 1977) should no longer be followed. *Frazier* had ruled that the option of whether or not to testify belonged to the witness spouse, and that a witness spouse is permitted, but may not be compelled, to testify in any criminal proceeding against a

defendant spouse as to any relevant and admissible matter save confidential communications between spouses.

2. *Euell* was decided June 29, 1979, and the instant case was tried thereafter on April 8, 1980.

evidence attempted to blacken her character and reputation to his own advantage and by doing so completely removed and destroyed the protection afforded him by the statute and the rule of the common law. Did the defendant by such evidence preserve the peace, confidence, and tranquility of the marital relation? The answer is obvious. The defendant by giving such evidence should not be permitted to take advantage of the statute. To permit him to do so would be contrary to all rules of justice. We rule that the defendant waived the privilege. Our ruling is supported by good authority. See 97 C.J.S. Witnesses Sec. 310, pp. 861–863, and cases there cited.

\*       \*       \*       \*       \*       \*

"When Mrs. Bledsoe was placed on the witness stand, she not only denied that she had told her husband about having an affair with a Negro but she was examined with reference to what occurred on the night of the shooting. Defendant had, prior to the time the wife testified, stated to the court that his objection should be considered as applying to each and every question asked of the witness. The witness was cross-examined as to all of these matters and in some respects the cross-examination went beyond the examination in chief.

\*       \*       \*       \*       \*       \*

"Much of defendant's evidence pertained to matters which may be classified as confidential between husband and wife. In such circumstances, justice demands that the wife should be permitted to testify. We rule that defendant by his evidence destroyed the shield of the statute and waived his privilege or right to object to his wife's testifying. . . ."

Defendant seeks to distinguish Bledsoe on the grounds that: (1) the defendant here did not testify to any confidential communication, as had the defendant in Bledsoe; and (2) defendant here did not attempt to blacken Deborah's name. With respect to the first attempted distinction, it might well be said that defendant's testimony did

reveal a confidential communication. According to him, upon discovering marijuana on the premises being renovated, he yelled at his wife demanding an explanation, to which she responded by running away.

However, we need not and do not rule as to whether this episode should be classified as "communication." Bledsoe should not be read as confined to a situation where a defendant discloses a confidential communication as the means by which to exculpate himself by casting the blame upon his spouse. This limitation on Bledsoe suggested by defendant would make sense if the law in this state were as stated in Trammel and Frazier. If that were true, the witness spouse would be free to testify as to anything other than confidential communications, and a waiver under Bledsoe would not be necessary to give her permission as to anything except confidential communications.

But the law in Missouri is not declared by Trammel and Frazier, but rather by Euell. Under the present Missouri rule as expressed in Euell, the spousal privilege extends beyond confidential communications; and a defendant should not be permitted to blacken his wife's name and then use the claim of privilege (even though unrelated to a confidential communication) to prevent the wife from responding in self-defense. Fair play requires that the spouse be given this right of response. Since the privilege in Missouri goes beyond mere confidential communication, so also the waiver by the defendant and the right of response by the wife must go beyond mere confidential communications.

Defendant's second attempted distinction from Bledsoe is belied by the record. The entire thrust of his defense from beginning to end was to throw the blame for the presence of narcotics upon his wife. Although he stresses that in his testimony he declined to say that the controlled substances in question belonged to his wife, the clear implication of even that portion of his testimony was that Deborah was responsi-

ble for their presence.[3] Certainly the whole import of defendant's testimony was that Deborah had equal control of the family premises and had had principal control of the Lincoln automobile from November 1 to 19, 1979, and that it was she, not he, who was responsible for the presence of the controlled substances on both the premises and in the trunk of the car.[4]

The issue here is controlled by *Bledsoe* and the trial court correctly so ruled.

Affirmed.

All concur.

---

3. Defendant's testimony in this regard was as follows:

"Q. It's your testimony that It's [sic] your wife's?

A. I don't know.

Q. Did you think it was your wife's at that time?

A. Yes; or one of her friends.

\* \* \* \* \* \*

A. I was thinking—I was thinking so much. *It was just repetitious [sic].* I just started thinking who in the hell would come in the house and put this stuff in here. Who would she let in the house."

4. In addition to his own testimony, defendant called Watson as a witness, who testified that he came to the Pendergras residence during the period November 1–19, 1979, and that at Deborah's request he carried a box, similar to the one found by the police in the automobile trunk, from the premises to the Lincoln and placed it in the trunk of that car. Deborah denied that such ever happened. Although the testimony by Watson may not in and of itself have constituted a waiver of the spousal privilege, nevertheless the offer of that testimony by defendant throws further light on the nature of his whole defense as being an attempt to implicate Deborah as the really guilty person.