**STATE of Missouri, Respondent,**

v.

**William M. PHEGLEY, Appellant.**

**No. WD 44879.**

Missouri Court of Appeals,
Western District.

March 10, 1992.

James J. Wheeler, Keytesville, for appellant.

William L. Webster, Atty. Gen. and Hugh L. Marshall, Asst. Atty. Gen., Jefferson City, for respondent.

Before LOWENSTEIN, C.J., and SHANGLER and SMART, JJ.

SHANGLER, Judge.

The defendant Phegley was convicted by a jury of possession of more than thirty-five grams of marihuana in violation of § 195.202, RSMo Cum.Supp.1991,[1] and of production of marihuana, § 195.211, and was sentenced to consecutive terms of two years and seven years.

The physical evidence used to prosecute the defendant Phegley was seized in a search of an old Methodist church building under a warrant issued by an associate circuit judge. The warrant was executed on November 2, 1989, by law officers of Chariton County, the Missouri Highway Patrol, the Internal Revenue Service and the Drug Enforcement Administration. The old church building was located in Prairie Hill, Missouri, but was part of the Salisbury mail route known as Route 1, Box 187. The mailbox outside the church structure was marked *Lisa and Mike Phegley, Route 1.* The building was Phegley's mailing address from June 9, 1989, until November 13, 1989, when he signed a change of address form to designate a place in Centralia as his new address.

The building searched had been a church structure, with two outside entrances. One led to the main part of the building, and the other to the basement. The basement was only accessible from an outside entrance and not from the main floor. Phegley had purchased the building, although a deed never issued. Phegley had performed some carpentry on the main

---

1. Unless otherwise noted, all statutory references are to RSMo Cum.Supp.1991.

floor to build some apartments, but the work was never completed.

The search was conducted at mid-morning on November 2, 1989. The windows of the building were hung at full length with blankets. The electricity was in Phegley's name, and billed to a Centralia mailing address. The water was also in his name. A car parked in front of the building was registered in Phegley's name. Lisa Shuck, whom Phegley later married, was living in the old church building at the time the officers conducted the search of the premises.

The search of the basement discovered a hydroponic marihuana cultivation operation. Water which contained nutrients was continuously pumped through and carbon dioxide, on which the plant thrived, was introduced into the air. Five hundred and sixty-seven marihuana plants were confiscated in the basement, as well as an assortment of marihuana growing equipment. Many personal effects belonging to Phegley were also seized. The search of the main floor yielded marihuana that was hanging to dry, a baggie of marihuana atop a footlocker in a bedroom, numerous articles of male and female clothing, a telephone bill addressed to Phegley at the Salisbury address, books dealing with marihuana horticulture, and numerous other items of property. The footlocker in the bedroom was unlocked and many of its contents seized.[2]

In the course of the search, Sgt. Swearingen of the Missouri Highway Patrol dusted items in the grow room for fingerprints. Six of them were found to have usable prints, and Phegley's fingerprints appeared on one of the grow trays. Phegley was arrested at a sawmill in Sturgeon, Missouri, where he worked. Sgt. Belshe, who made the arrest and took custody of Phegley, also administered the *Miranda* warning to him. In response to inquiry as to his name and address, Phegley responded to Cpl. Benitz of the Missouri Highway Patrol that his address was Route 1, Box 187, Salisbury, Missouri. Phegley then asked Benitz "if he could tell [Benitz] something," and stated "Lisa did not have anything to do with this. She doesn't know anything about it."

Phegley brought a motion to quash those custodial oral statements as in violation of the principle of *Miranda*. He moved separately to quash the search warrant and to suppress illegally obtained evidence, and then to suppress the evidence obtained by the State in the seizure and search of the footlocker. Each motion was denied in turn.

Phegley presented numerous witnesses, a number of them to attest to his good character. Leslie McKenney employed Phegley at a sawmill not far from Centralia. He considered Phegley to be a dependable worker who was never absent. In the summer of 1989, they logged timber together, working the day long until darkness fell. The logging continued into the fall of 1989, and was a seven day week operation. One of the witnesses, Eddie Ray, testified that in 1983 or 1984, when he lived in Kirksville and Phegley lived in Jefferson City, Phegley allowed Ray to use his address to order lights and other such materials. Ray then retrieved the items at Phegley's. Some of the items were ordered from Superior Growers Supply, Inc., suppliers of hydroponic growing equipment. Phegley moved to Prairie Hill in the spring of 1989, and Ray received his consent to store equipment there. Ray testified that Phegley moved from Prairie Hill in 1989, but that Lisa Shuck continued to live in the old church building.

John White owned the sawmill operated by witness McKenney. In the summer and fall of 1989, Phegley scaled the logs at the sawmill. White knew Phegley was living in Centralia during that time. Rickey Anderson testified that in the summer and fall of 1989, he lived at the home of his grandmother in Centralia with Phegley. Laura Hurt lived within sight of the old church building. She had seen Phegley at the church building once or twice. She became acquainted with Lisa Shuck in the

---

**2.** A virtual inventory of the property seized by the officers under the search warrant is reconst-

ituted from the evidence in the respondent State's brief and is restated as Appendix A.

fall of 1989, and visited her in the old church building where Shuck lived. Hurt saw nothing in the building that she thought was marihuana or marihuana equipment.

Phegley testified that he left Prairie Hill because it was too far a drive from Centralia where he scaled logs for two mills. Phegley and Lisa remained friendly. He left many of his belongings with her in Prairie Hill because he had only one room in Centralia. He returned two or three times a month to see Lisa, and she visited him in Centralia. She brought him his mail, which continued to come to Prairie Hill, although he also received some at Centralia. Phegley and Lisa Shuck married in January of 1991.

Phegley confirmed the testimony of witness Ray, that he agreed for Ray to send his mail to Phegley for him to hold until Ray claimed them. When Phegley moved to the old church buidling, Ray stored items there.

The jury found Phegley guilty of possession of marihuana and production of marihuana and assessed punishment at two years and seven years imprisonment, respectively. The court ordered the sentences to run consecutively.

## I.

### Sufficiency of the Evidence

Phegley acknowledges that evidence of either actual or constructive possession of marihuana suffices to prove the offense under § 195.202. He postulates also that the proof of production of a controlled substance under § 195.211, "almost certainly encompasses the proof of the offense of possession." Phegley argues that the evidence proves neither actual nor constructive possession, and since there was no direct proof of production of marihuana and since "constructive" production is not a workable legal precept, neither possession nor production was proven as an offense.

### The Possession Offense

Definitions section 195.010(33) of the Comprehensive Drug Control Act of 1989 prescribes definitions of "possessed" or "possessing a controlled substance":

[A] person, with the knowledge of the presence of and illegal nature of a substance, has actual or constructive possession of the substance. A person has actual possession if he has the substance on his person or within easy reach and convenient control. A person who, although not in actual possession, has the power and the intention at a given time to exercise dominion or control over the substance either directly or through another person or persons is in constructive possession of it. Possession also may be sole or joint. If one person alone has possession of a substance possession is sole. If two or more persons share possession of a substance, possession is joint.

There was no evidence that on or about November 2, 1989, Phegley had the substance "on his person or within easy reach and convenient control," and so was in actual possession of the marihuana seized at the old church building premises. He was then more than forty-five miles away, at the sawmill in Centralia. Nor was there any direct evidence that Phegley manufactured the marihuana seized under the warrant.

■ The charge of unlawful possession of a controlled substance under § 195.202 requires proof that the accused was aware of the presence and illegal character of the particular substance and had conscious possession of it. *State v. Mitchell*, 811 S.W.2d 809, 812[6, 7] (Mo.App.1991). For the penal purposes of the Act, actual possession need not be shown, proof of constructive possession will suffice. "A person who, although not in actual possession, has the power and the intention at a given time to exercise dominion or control over the substance either directly or through another person or persons is in constructive possession of it." § 195.010(33). The elements of the offense, whether charged in terms of actual or constructive possession, may be proven by circumstantial evidence. *State v. Vitale*, 801 S.W.2d 451, 456[13, 14] (Mo.App. 1990).

The definition of possession that § 195.-010(33) of the 1989 enactment renders does not ease the proof required for submission under the predecessor statute, as the prosecution seems to argue. In particular, the component of the definition of possession—that a person not in actual possession who has "the power and the intention at a given time to exercise dominion or control over the substance" is in constructive possession of the substance—does not vary the meaning of constructive possession nor its legal proof under the predecessor statute.

There was no statutory definition of possession, nor distinction drawn between actual and constructive possession, in any enactment prior to the adoption of the Comprehensive Drug Control Act of 1989. It is evident from the choice of the terms and phrases that the statute enacts that the definition of possession, actual and constructive, adopts and connotes the gloss of antecedent judicial opinions. *See, e.g., State v. Burns,* 457 S.W.2d 721, 725[3, 4] (Mo.1970); *State v. Wiley,* 522 S.W.2d 281, 292[20, 21] (Mo. banc 1975); *State v. Cline,* 808 S.W.2d 822, 823[1, 2] (Mo. banc 1991); *State v. Lowe,* 574 S.W.2d 515, 517[1–3] (Mo.App.1978). It is evident that our post-Act of 1989 judicial opinions accord to the statutory definition the legal effect of the antecedent substantive law. *See, e.g., State v. Mitchell,* 811 S.W.2d 809.

The statute also provides that the possession subject to the sanction of the Act, whether actual or constructive, may be sole or joint. That element of definition also reflects the law as already developed. *Id.; State v. McGee,* 473 S.W.2d 686, 687 (Mo. 1971); *State v. Lowe,* 574 S.W.2d at 517[3].

■ To determine whether sufficient evidence was presented to allow a reasonable jury to have found Phegley guilty of the accusations beyond a reasonable doubt, the court of review accepts as true all the evidence favorable to the verdict and disregards all evidence and inferences to the contrary. *State v. Dulany,* 781 S.W.2d 52, 55[2, 3] (Mo. banc 1989). We conclude that there was substantial evidence from which the jury could find that on November 2, 1989, Phegley was in constructive and joint knowing possession of the Prairie Hill old church building and of the more than 35 grams of marihuana seized from the premises.

The constructive and joint possession by Phegley and Shuck of the marihuana seized was proven by a flood of evidence. Phegley owned the premises and lived there with Shuck, whom he later married, until the spring of 1989, when he moved to his work in Centralia. Shuck continued to reside there, and was living there when the search warrant was executed on November 2, 1989. The mailbox outside the old church building premises was marked *Lisa and Mike Phegley,* and remained so after he moved to Centralia. Phegley continued to receive his mail there regularly. The electricity was in his name, as was the water service. His car remained on the premises even after he went to Centralia. His clothing and personal effects remained in the bedroom of the old church building, as were articles of female clothing. A prescription bottle in the bedroom, dated September 26, 1989, bore his name. The footlocker in the bedroom contained his bank statements and other personal possessions. His fingerprints appeared on one of the grow trays. Cultivated marihuana was found hung to dry in the bathroom. There was also a baggie of marihuana on his footlocker. In addition to all of this, and the plethora described in Appendix A, 567 plants of marihuana were found on the premises and taken.

■ In a case where an accused is in exclusive control of premises, the law makes the inference that a contraband substance found there also rests within the accused's possession and control. *State v. Wiley,* 522 S.W.2d at 292[20, 21]. In a case where the premises are shared, a like inference of possession of the contraband does not arise in the absence of additional circumstances to inculpate the accused. *State v. Lowe,* 574 S.W.2d at 517[3]. These additional circumstances the ownership of the home by Phegley, the inferences of his free use and continued access to the premises, his maintenance of the utilities, the pervasive incidence of marihuana through-

out the home, upon his locker, and every stage of cultivation, growth and harvest— combine to raise the inference of Phegley's knowledge of the presence and illegal nature of the substance. These factors suffice also for the inference that, at the time he was charged in the information, Phegley had "the power and the intention at a given time to exercise dominion or control over the substance either directly" or indirectly. § 195.010(33); *State v. Mitchell,* 811 S.W.2d at 813; *State v. Matthews,* 790 S.W.2d 271, 272[5] (Mo.App.1990).

### The Production Offense

Production under the Act means and includes "the manufacture, planting, cultivation, growing, or harvesting of drug paraphernalia or of a controlled substance." § 195.010(35). Phegley was charged with the knowing production, including planting, cultivation and growing of marihuana. § 195.211. That was the crime submitted to the jury and which the jury found by verdict. The attack on the sufficiency of the production count re-articulates the theory that the proof of possession is an implicit concomitant of the proof of production, and since "the circumstances do not prove possession, they do not prove production."

■ The gist of production of a controlled substance by cultivation under the statute is the promoting or improving the growth of a plant by labor or attention, with knowledge of the illegal character of the plant. *State v. LaMaster,* 811 S.W.2d 837, 839 (Mo.App.1991); *State v. Brown,* 750 S.W.2d 715, 717[4] (Mo.App.1988). There is no element of possession in that gist. The possession of a controlled substance with the intent to produce is a species of offense under § 195.211, quite apart from the possession of a controlled substance and the production of a controlled substance charged against Phegley. *See State v. Munson,* 714 S.W.2d 515, 522[12, 13] (Mo. banc 1986).

■ The essential complaint Phegley makes against the conviction for the know-

ing production of marihuana is the circumstantial nature of the proof. He stakes his argument of insufficiency of the proof for conviction on those snatches of the evidence that favor a "reasonable theory of innocence" such as the testimony that he was not physically present in Prairie Hill for thirty-three days before the search and arrest on November 2, 1989, that he was then living in Centralia, and that he worked 45 miles away. He ignores the mass of inferences that favor guilt.

There was evidence of a hydroponic marihuana cultivation enterprise in full operation on the premises he owned and continued to maintain. Five hundred and sixty-seven marihuana plants had been grown and were 'seized. There was marihuana growing in trays, and fertilizer and other media for growing the substance. There were carbon dioxide canisters to nourish the plants, an electric generator to power the grow lights, and all kinds of equipment to facilitate and maintain the cultivation of marihuana. In addition to all of the other items of production and cultivation adjuncts discovered and seized on the premises [3], books on marihuana horticulture were also taken from Phegley's footlocker next to the bed, as well as a diagram of the growing operation's system and thirty-five issues of High Times magazine, which dealt with indoor marihuana cultivation. The evidence that Phegley promoted the cultivation and growth of the controlled substance marihuana with knowledge of its illicit nature pervades the record. The conviction of offense under § 195.211 is affirmed.

### II.

### Alibi Defense

Phegley tendered alibi instructions on the model of MAI–Cr 3d 308.04 for separate submissions under the possession and production counts. The instructions posed as the issue: "whether the defendant was present in the old church building in Prairie Hill on or about November 2, 1989." The

3. See Appendix A.

court refused them and Phegley contends that was error.

 Where the presence of the defendant at the time and place of the commission of the crime is essential to guilt, the prosecution must prove such presence beyond a reasonable doubt. *State v. Hubbard,* 351 Mo. 143, 171 S.W.2d 701, 706[11] (1943). Alibi is an allegation that the accused was at a place other than the place where the crime was committed at the time it was committed. It is designed to prove that under the circumstances in evidence, it was impossible for the defendant to have participated in the commission of the offense. And although the allegation is defensive, alibi is not a true defense. That is because, where the presence of the defendant at the place and time of the commission of the crime is essential to guilt, the burden is always on the prosecution to prove such presence beyond a reasonable doubt. *State v. Hubbard,* 351 Mo. 143, 171 S.W.2d at 706[11]; *State v. Reece,* 324 S.W.2d 656, 661[11–13] (Mo.1959). A defendant is entitled to have the issue of alibi submitted to the jury where there is evidence to support the submission and the instruction is requested. *State v. Webb,* 423 S.W.2d 795, 797[1, 2] (Mo.1968). Where the presence of the defendant is not a determinative issue of his guilt, however, alibi is properly refused. *State v. Engleman,* 634 S.W.2d 466, 481 (Mo.1982). Presence is not a material element of the crime of possession under § 195.202. A person who "has the power and the intention at a given time to exercise dominion or control over the substance either directly or through another person or persons" is in possession of the controlled substance. § 195.010(33). Presence is not a material element of the crime of production under § 195.211. A person who cultivates a controlled substance, here marihuana, is in production of that substance. § 195.-010(35); *State v. Brown,* 750 S.W.2d at 717[5]; *State v. LaMaster,* 811 S.W.2d at 839. The instructions were properly refused.

## III.

### Prosecutorial Cross–Examination

Phegley took the stand and became a witness. In response to direct examination, Phegley was asked about his marriage to Lisa Shuck. Phegley had testified that Lisa was living in the old church building at Prairie Hill until the day of the search of the premises by the officers, and her arrest, on November 2, 1989. The direct examination proceeded:

Q. Now, you married Lisa Shuck; did you not?

A. Yes, sir.

Q. How long ago?

A. January 19 of 91.

Q. Why did you marry her? [emphasis added]

A. Because I love her.

Q. And when you were with her in the year of 1989 and prior to the time of the arrest, did you have any reason to think Lisa Shuck was involved in drugs?

A. Absolutely not.

Q. Do you have any reason now to think she was in that period of time?

A. I do now.

Q. But—Has she reformed?

A. Yes, sir.

Q. And you married her?

A. Yes, sir.

Q. Can you look at the ladies and gentlemen of this jury and tell them that you know that Lisa Shuck will never again be involved in drugs?

A. Yes, sir, I can.

On cross-examination the prosecutor asked: "Now, isn't it true that you and Lisa Shuck got married so you wouldn't have to testify against each other in each of your trials?" The defendant objected, but the court ruled that his prior question, "Why did you marry her?" had introduced the subject, and allowed the question to stand. There was no response, and the prosecutor was done. The defendant argues that the question of the prosecutor was a direct reference to the failure of the defendant to call his wife to testify, and so

was in violation of § 546.270, RSMo 1986.[4] He argues, moreover, that the question was put in bad faith, since the prosecutor knew that, if called, the wife could claim the right against self-incrimination.

■ Criminal defendant who elects to testify "shall be liable to cross-examination, as to any matter referred to in his examination in chief, and may be contradicted and impeached as any other witness in the case." § 546.260, RSMo 1986; *State v. Bellah,* 745 S.W.2d 213, 216[3, 4] (Mo. App.1987). A defendant who tenders a subject beyond the corpus delicti extends the scope of inquiry to all evidence of like quality. *State v. Dalton,* 433 S.W.2d 562, 563-64[1–3] (Mo.1968). The scope of allowable cross-examination is governed by the trial court according to the circumstances of the case. *State v. Bellah,* 745 S.W.2d at 216[3, 4].

■ A criminal defendant who elects to testify does not thereby relinquish the privilege to exclude the testimony of the spouse against him. § 546.260, RSMo 1986; *State v. Pendergras,* 621 S.W.2d 68, 70 (Mo.App.1981). There is nevertheless an exception to that rule of privilege. A criminal defendant who testifies, and in so doing, vilifies the spouse to the end of self-exculpation, waives the privilege and frees the spouse to rehabilitate herself by testimony. *State v. Pendergras,* 621 S.W.2d at 71; *State v. Lowe,* 647 S.W.2d 196, 197[2–6] (Mo.App.1983); W. Knox, M. Berger & R. Duncan, *Missouri Criminal Practice and Procedure,* § 433 (1985). The sequence of responses given by Phegley on direct examination concerning his marriage to Lisa Shuck was readily and reasonably understood by the jury to impute to his then wife the sole culpability for the possession and production of the controlled substances discovered and seized during the execution of the search warrant. The disposition of his evidence, and the theory of the Phegley defense, was that his only connection with

the old church building was his ownership of the premises and the personal paraphernalia that he necessarily left behind. He was removed by work and distance from Prairie Hill during the period of the illicit activity and could not have possessed the marihuana nor participated in its production, or known of any of it. Lisa alone occupied the premises, and she alone controlled what happened there. The further import of his testimony was that he learned only at the time of her arrest [on November 2, 1989] that Lisa was "involved in drugs," but she since has "reformed," and only then did he marry her. Phegley then vouched to the jury that Lisa Shuck would "never again be involved in drugs." It was in that context of evidence that the question of the prosecutor was allowed and remained to stand: "Now, isn't it true that you and Lisa Shuck got married so you wouldn't have to testify against each other in each of your trials."

That spate of aspersions of criminal conduct to spare himself from prosecution at the expense of his wife worked a waiver of the spousal privilege. The contention that the question was wanting in good faith because the prosecutor "knew the wife could claim the Fifth Amendment and could not be compelled to testify, regardless of marriage," is quite irrelevant to the principle of fair play that deems the waiver. *State v. Bledsoe,* 325 S.W.2d 762, 766[4] (Mo.1959). The contention, in any event, is of questionable validity where, as here, the wife has already suffered conviction and her testimony poses no likely danger to her of further prosecution. *See Murphy v. Waterfront Comm'n of New York Harbor,* 378 U.S. 52, 100–101, 84 S.Ct. 1594, 1614–15, 12 L.Ed.2d 678 (1964); *United States v. Gernie,* 252 F.2d 664, 670[6] (2d Cir.1958).

### IV.

#### The Search and Seizure

■ The final points contend that the denial by the trial court to suppress the

---

4. That statute provides: "If the accused shall not avail himself or herself of his or her right to testify, or of the testimony of the wife or husband, in the trial of the case, it shall not be construed to affect the innocence or guilt of the accused, nor shall the same raise any presumption of guilt, nor be referred to by any attorney in the case, nor be considered by the court or jury before whom the trial takes place."

evidence seized during the search of the old church building was error because (1) the affidavit in support of the search warrant failed to show probable cause of criminal activity and (2) the search of the secured footlocker was beyond the scope of the warrant and the officers were otherwise without probable cause to believe that it contained illegal material.

The argument concedes that the affidavit in support of the search warrant issued in this case was discussed, examined and approved in the companion prosecution, *State v. Shuck,* 800 S.W.2d 49 (Mo.App.1990). He diverts the full complaint, rather, to the search of the footlocker in the bedroom. The officer forced open the footlocker with a tire tool and seized numerous items relating to the growth and production of marihuana. The legal file does not contain a copy of the search warrant. The terms, directions, and scope of the warrant are before us in paraphrase from the motion to suppress. The warrant directed the search of premises particularly described for "marijuana, marijuana growing equipment, drug paraphernalia, other marijuana growing products, records, photos, or documents relating to drug activity." The footlocker was found in a bedroom of the premises to be searched. Atop the footlocker was a baggie of marihuana. In the bedroom, behind the headboard of the bed, was also an envelope containing advertisements for marihuana seed catalogues and light systems. Magazines dealing with marihuana culture were also taken from the dresser there, as well as from behind the headboard. The building throughout, upstairs and downstairs, was replete with marihuana seeds, growing plants and curing marihuana, as well as all of the paraphernalia necessary for marihuana production. It is within these found circumstances that the officers saw and then seized the footlocker and its contents.

It is the sense of Phegley's argument that, the validity of the search warrant assumed, the footlocker was not an item described in the search warrant, nor were its contents in plain view, nor its appearance such as to immediately cause the conclusion it contained the evidence described in the warrant. Hence, the seizure of its contents was beyond the scope of the warrant, was not validated by any exception to a warrantless search, and violated his right of privacy as to that property. That argument is mistaken both in premise and in principle.

It is the search that compromises the individual interest in privacy. The seizure invades the owner's interest in possession. *United States v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984). The officer was lawfully upon the premises under a valid search warrant, hence any invasion of privacy was justified. Moreover, it was under the authority of the warrant that the officer came to the bedroom and the footlocker in plain view. "If an article is already in plain view, neither its observation nor its seizure would involve any invasion of privacy." *Horton v. California,* 496 U.S. 128, 110 S.Ct. 2301, 2306[2-4], 110 L.Ed.2d 112 (1990). It is the warrantless seizure of the footlocker and its contents, and hence that intrusion into his interest in the possession of that property, that Phegley claims was unlawfully compromised.

The essential predicate to a valid warrantless seizure, that the officer was lawfully in the place from which the evidence was plainly viewed, adds two concomitants: not only must the item be in plain view, but its incriminating character must be immediately apparent. *Id.* 110 S.Ct. at 2308[5-7]; *Arizona v. Hicks,* 480 U.S. 321, 326-27, 107 S.Ct. 1149, 1153-54, 94 L.Ed.2d 347 (1987). Inadvertent discovery of the evidence is not a necessary condition. Thus, "the fact that an officer is interested in an item of evidence and fully expects to find it in the course of a search should not invalidate its seizure if the search is confined in area and duration by the terms of a warrant or a valid exception to the warrant requirement." *Horton v. California,* 496 U.S. 128, 110 S.Ct. at 2309[8, 9].

Here, the scope of the search was not unduly enlarged by the omission of reference to a footlocker in the warrant. Police with a warrant for "marijuana, marijuana growing equipment, drug paraphernalia,

other marijuana growing products, records, photos, or documents relating to drug activity" may search in places where such items might be. *Coolidge v. New Hampshire*, 403 U.S. 443, 517, 91 S.Ct. 2022, 2063, 29 L.Ed.2d 564 (1971). The footlocker was discovered during a lawful search under a valid warrant. It was in a place where the items described in the search warrant might be. The footlocker shared with the back of the nearby bedpost and dresser the incriminating characteristic of a place to hide "records, photos or documents relating to drug activity," and other items of the search. The bedroom was strewn with hanging and fallen marihuana plant material, and a baggie of the substance was atop the locker itself. The officers had probable cause to believe that the footlocker contained the evidence for which the search warrant issued, and the seizure was authorized by the plain view doctrine. *Arizona v. Hicks*, 480 U.S. at 327, 107 S.Ct. at 1153; *Horton v. California*, 496 U.S. 128, 110 S.Ct. at 2311; *State v. Abbott*, 664 S.W.2d 537, 542[4] (Mo.App.1983).

The judgment and convictions are affirmed.

All concur.

## APPENDIX A

Following is taken from Respondent's brief which included a listing of items seized as a result of a search warrant issued for the residence of Mike Phegley in Prairie Hill, Missouri, commonly referred to as the Old Methodist Church.

ITEMS FOUND IN THE BASEMENT INCLUDED:

1. An electric generator to boost power to grow lights
2. Marijuana growing in trays
3. Three grow lights (at least one turned on)
4. Three fans
5. Fertilizer and growing media
6. Harvested marijuana
7. $CO_2$ cannister, hooked up to deliver $CO_2$ to the growing plants
8. A garden hose connected to a water line in the basement
9. Spray bottles and buckets
10. Humidity gauge and temperature gauges
11. Box from SGS (Superior Grower Supply), Inc., addressed to "Mike Phegley, Rt. 1, Box 187, Salisbury, MO"
12. Two garden planter calendars with notations including the word "cut" written on the dates July 16 and August 14
13. Bottles of "Wonder Grow Concentrated Nutrient Solution No. 1," "Wonder Grow Concentrated Nutrient Solution No. 2," root stimulator, plant starter solution, "Security Root Tone—Rooting Hormone," and "Fertilong Rooting Powder"
14. Bag of vermiculite soil conditioner
15. Spare grow bulbs, a grow light shade, and a watering can
16. Fifteen small trays for growing marijuana
17. Fourteen large trays for growing marijuana
18. Several empty $CO_2$ cannisters
19. A box on a shelf containing various personal effects of appellant including an old library card issued to "Mike Phegley" and an old bank card issued to "William M. Phegley"
20. A photo on the shelf of appellant with a young child
21. A grey plastic tub with two one-gallon jugs of "Formula One" fertilizer and an electric bilge pump

ITEMS FOUND IN THE MAIN FLOOR INCLUDED:

1. Marijuana hanging to dry on a string in the bathroom, described as "close to seedless" indicating that it had been cultivated
2. A baggy of marijuana on top of a footlocker beside the bed in the northwest bedroom
3. Various articles of male (and female) clothing in the northwest bedroom

4. A new box of Growdan growing medium, a new ballast, and a new grow light stored just off the living room area

5. Two boxes with shipping labels to "Mike Phegley, Route 1, Box 187, Salisbury, Missouri"

6. A prescription bottle in the bedroom labeled to "Michael Phegley," dated September 26, 1989

7. A telephone bill in the kitchen addressed to "Mike Phegley, Route 1, Box 187, P.O. Box 35, Salisbury, Missouri"

8. An envelope from SGS, Inc. to "Mike Pheeley [sic], Route 1, Box 187, Salisbury, Missouri"

9. An envelope in the bedroom from a private mailbox in Oakland, California, with a C.O.D. label on it, containing advertisements for marijuana seed catalogues and light systems, and ads from SGS, Inc.

10. A light rotor for a grow light

11. A box in new condition with a mailing label addressed to "Mike Figley [sic], Route 1, Box 187, Salisbury, Missouri"

12. Books entitled *Indoor Marijuana Horticulture, Marijuana Grower's Guide, Marijuana Potency, Marijuana Botany*, and *The Sinsemilla Technique* in the footlocker next to the bed

13. Two garden planter calendars in the kitchen with notations such as "William's Wonder" and "Garlic Bud"

14. Various bags of marijuana seeds with such homemade labels as "William's Wonder," and "Garlic Bud," and "Skunk 1 Basic 5"

15. An invoice in the footlocker from Superior Grower Supply to Mike Phegley

16. Bank statements of Mike Phegley in the footlocker

17. An envelope in the footlocker postmarked October 15, 1987, from Oakland, California, addressed to "Mike Phegley, 1815 Ellis Street, Jefferson City, Missouri 65102" (Appellant testified that he lived in Jefferson City in 1987)

18. Three photos of appellant found in the kitchen area

19. A piece of paper in the footlocker with a diagram of the growing operation's ebb-flow system.

20. A cedar box in the footlocker, containing vials and bags of seed and plant material

21. Forty-six *High Times* magazines thirty-five from the footlocker, six from the dresser and five from behind the headboard, all of which feature articles on growing marijuana indoors and advertisements from Superior Grower Supply, Inc.

22. Various items of drug paraphernalia from a dresser in the bedroom

23. A counter balance scale in the bedroom, and

24. An envelope addressed to Mike Phegley containing bottles labeled "Censa Spray"